**UNITED STATES, Appellee,**

**v.**

**Dwight R. BELL, Private First Class U.S. Army, Appellant.**

**No. 66,143.**
**CMR No. 8903667.**

U.S. Court of Military Appeals.

Argued Feb. 3, 1993.

Decided Sept. 30, 1993.

For Appellant: *Justin M. Miller* (argued); *Gregory B. English* and *Captain Victor A. Tall* (on brief).

For Appellee: *Captain Samuel J. Smith, Jr.* (argued); *Colonel Dayton M. Cramer, Lieutenant Colonel Joseph A. Russelburg, Captain Donna E. Barlett* (on brief); *Lieutenant Colonel Daniel J.*

*Dell'Orto, Major Edith M. Rob, Major James L. Pohl.*

## PER CURIAM:

Appellant has been convicted in a contested trial of two specifications of wrongful distribution of crack cocaine. He has also been convicted of wrongful use of crack cocaine. The Court of Military Review affirmed these findings. We granted review to consider two issues. 36 MJ 204.

The Court upholds the decision below as to the distribution specifications for the reasons stated in the opinion by Judge COX, joined by Chief Judge SULLIVAN and Judge CRAWFORD; and in the separate opinion by Judge WISS. For the reasons stated in Judge GIERKE's opinion, he dissents from upholding the decision below as to the second distribution.

The Court, however, holds that the decision below as to the use specification is erroneous for the reasons stated in the opinions of Chief Judge SULLIVAN, and Judges GIERKE and WISS. This requires reassessment of the sentence which was affirmed below. For the reasons stated in Judge COX's opinion, he and Judge CRAWFORD dissent from this holding.

The decision of the United States Army Court of Military Review on remand (34 MJ 846) is reversed as to specification 3 of the Charge and the sentence. The finding of guilty thereon is set aside, and that specification is dismissed. The record of trial is returned to the Judge Advocate General of the Army for remand to that court for reassessment of the sentence based on the remaining findings of guilty. In all other respects the decision below is affirmed.

## COX, Judge:

A general court-martial, convened at Fort Campbell, Kentucky, convicted appellant, contrary to his pleas, of two specifications of wrongfully distributing and one specification of wrongfully using crack cocaine, in violation of Article 112a, Uniform Code of Military Justice, 10 USC § 912a. The officer and enlisted panel sentenced appellant to a dishonorable discharge, con-

finement for 20 years, total forfeitures, and reduction to E–1. The Court of Military Review, in an unpublished opinion, affirmed the findings of guilty but reduced the confinement to 10 years. Otherwise, it affirmed the sentence.

On initial petition to this Court, we set aside the decision of the Court of Military Review and remanded the case to that court for reconsideration in light of our decision in *United States v. Cooper* (*Cooper* I), 33 MJ 356 (1991). *United States v. Bell*, 34 MJ 72 (CMA 1991). The Court of Military Review, relying on the *Cooper* majority, again affirmed. *United States v. Bell*, 34 MJ 846 (1992). Subsequent to the Court of Military Review's second *Bell* decision, we reconsidered *Cooper*, which we again affirmed in a divided opinion. *United States v. Cooper* (*Cooper* II), 35 MJ 417 (CMA 1992).

Bell is again before us on these issues:

### I

WHETHER THE TARGETING AND SOLICITING OF APPELLANT (A COCAINE ADDICT SEEKING RECOVERY IN A REHABILITATION PROGRAM) TO OBTAIN DRUGS IS VIOLATIVE OF GOVERNING DIRECTIVES AND DUE PROCESS ENTRAPMENT.

### II

WHETHER THE GOVERNMENT DISPROVED THE DEFENSE OF ENTRAPMENT BEYOND A REASONABLE DOUBT.

*Statutory–Construction Entrapment*

As the Supreme Court has observed:

[E]ntrapment is a relatively limited defense. It is rooted, not in any authority of the Judicial Branch to dismiss prosecutions for what it feels to have been "overzealous law enforcement," but instead in the notion that Congress could not have intended criminal punishment for a defendant who has committed all the elements of a proscribed offense but was

induced to commit them by the Government.

■ Sorrells [v. United States, 287 U.S. 435, 53 S.Ct. 210, 77 L.Ed. 413 (1932)] and Sherman [v. United States, 356 U.S. 369, 78 S.Ct. 819, 2 L.Ed.2d 848 (1958)] both recognize "that the fact that officers or employees of the Government merely afford opportunities or facilities for the commission of the offense does not defeat the prosecution," 287 U.S., at 441, 53 S.Ct., at 212; 356 U.S., at 372, 78 S.Ct., at 820–21. Nor will the mere fact of deceit defeat a prosecution, see, e.g., Lewis v. United States, 385 U.S. 206, 208–209, 87 S.Ct. 424, 425–26, 17 L.Ed.2d 312 (1966), for there are circumstances when the use of deceit is the only practicable law enforcement technique available. It is only when the Government's deception actually implants the criminal design in the mind of the defendant that the defense of entrapment comes into play.

United States v. Russell, 411 U.S. 423, 435–36, 93 S.Ct. 1637, 1644–45, 36 L.Ed.2d 366 (1973).

■ The office of the entrapment defense is to draw the line "between the trap for the unwary innocent and the trap for the unwary criminal." Sherman v. United States, supra at 372, 78 S.Ct. 820–26. Where the issue of entrapment is raised by the evidence, "the prosecution must prove beyond reasonable doubt that the defendant was disposed to commit the criminal act prior to first being approached by Government agents." Jacobson v. United States, — U.S. —, —, 112 S.Ct. 1535, 1540, 118 L.Ed.2d 174 (1992). To facilitate that determination, the defendant "may examine the conduct of the government agent." Sherman v. United States, supra at 373, 78 S.Ct. at 821.

■ "[O]n the other hand, the accused will be subjected to an appropriate and searching inquiry into his own conduct and predisposition' as bearing on his claim of innocence." Id., quoting Sorrells v. United States, supra at 451, 53 S.Ct. at 216. The entrapment doctrine does not require

law enforcement agents to have evidence of a defendant's criminal activity before approaching the defendant. E.g., United States v. Swets, 563 F.2d 989, 991 (10th Cir.1977), cert. denied, 434 U.S. 1022, 98 S.Ct. 748, 54 L.Ed.2d 770 (1978). Evidence that "a person accepts a criminal offer without being offered extraordinary inducements ... demonstrates his predisposition to commit the type of crime involved." United States v. Evans, 924 F.2d 714, 718 (7th Cir.1991); see also United States v. Ford, 918 F.2d 1343 (8th Cir.1990).

Regarding drug transactions and entrapment, the Supreme Court has commented that an agent deployed to stop the traffic in illegal drugs may offer the opportunity to buy or sell drugs, and, if the offer is accepted, make an arrest on the spot or later. In such a typical case, or in a more elaborate "sting" operation involving government-sponsored fencing where the defendant is simply provided with the opportunity to commit a crime, the entrapment defense is of little use because the ready commission of the criminal act amply demonstrates the defendant's predisposition.

Jacobson v. United States, supra at —, 112 S.Ct. at 1541.

Military entrapment law mirrors the federal counterpart. United States v. Tatum, 36 MJ 302 (CMA 1993); United States v. Cooper, 35 MJ 417 (CMA 1992); United States v. Whittle, 34 MJ 206 (CMA 1992); United States v. Dayton, 29 MJ 6 (CMA 1989); United States v. Clark, 28 MJ 401 (CMA 1989); United States v. Vanzandt, 14 MJ 332 (CMA 1982); RCM 916(g), Manual for Courts–Martial, United States, 1984.

■ In the instant case, appellant contends he was entrapped to transfer crack cocaine; and unquestionably, the entrapment defense was raised by appellant's own testimony. The factfinder, however, was not required to accept appellant's version of the events. Indeed, the court-martial was obviously persuaded beyond a reasonable doubt that appellant was not entrapped, as defined by the military judge's

instructions.[1] Being limited in our review to questions of law, Art. 67(c), UCMJ, 10 USC § 867(c)(1989), our function is to determine whether there were sufficient facts of record and permissible inferences from which a rational factfinder could have discounted entrapment as a defense, beyond a reasonable doubt. *Cf. Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); *United States v. Whittle*, 34 MJ 206, 209 (CMA 1992). This record abounds with such facts and inferences.

### Facts

The Court of Military Review has summarized the facts as follows:

Here, the CID [Criminal Investigation Command] was interested in targeting soldiers involved with cocaine and learned of the appellant's involvement with drugs through a registered source, one Nolte. Nolte had initially met the appellant while both were in Advanced Individual Training at Fort Rucker, Alabama. Nolte had apparently been a participant in the ADAPCP [Alcohol and Drug Abuse Prevention and Control Program] and was pending an administrative separation from the Army as a result of being a drug rehabilitation failure.[2] He became a registered source in an attempt to obtain CID help for himself since he was in legal trouble, having just a day or so before been apprehended for possession and use of marijuana. Nolte knew that the appellant was a cocaine addict, was "strung out," and would be an easy set-up. Nolte knew that appellant was using cocaine while in the ADAPCP program because the appellant had borrowed money from him to purchase cocaine and so told the CID. He did not share knowledge of the appellant's ADAPCP participation with CID. The CID did not learn that the appellant was a participant in the ADAPCP until trial.[3]

Immediately after being provided the appellant's name, Nolte, the registered source, and a CID agent went looking for the appellant. They quickly located him and, without any inducement, the appellant agreed to arrange an immediate purchase of cocaine for the CID agent who was posing as a friend of Nolte's. Following the appellant's directions, the group proceeded into the local civilian community where the appellant purchased cocaine for the CID agent with funds provided by the agent. Subsequently, the appellant made a second cocaine purchase for Nolte's "friend," the undercover CID agent, and used some of the drug himself. After this second incident the appellant was apprehended and ultimately tried, convicted, and sentenced by general court-martial.

34 MJ at 847.

The first of these transactions occurred on September 24, 1989, a day or two after Nolte had been caught smoking marijuana in the barracks. Acting on the advice of a friend that he might improve his circumstances, Nolte went to the CID and offered his services. The CID was interested in cocaine dealers; appellant was apparently the only person Nolte knew who was even using cocaine. Nolte claimed not to know whether appellant actually dealt cocaine,

---

**1.** The military judge instructed the court members on the entrapment defense in accordance with RCM 916(g), Manual for Courts-Martial, United States, 1984, and paragraph 5-6, Military Judges' Benchbook at 5-15 (Dept. of the Army Pamphlet 27-9 (Change 1, Feb.1985)). Appellant has made no complaint, here or at trial, that the military judge erred in any respect regarding these instructions.

**2.** With all deference to the Court of Military Review's factfinding power, Art. 66(c), Uniform Code of Military Justice, 10 USC § 866(c), the only evidence of record we can find of Nolte's involvement with ADAPCP is his statement that he himself went to ADAPCP several days after the first transaction and went through a 3–day counseling program, after which he was declared a rehabilitation failure.

**3.** The Chief of the Drug Suppression Team at Fort Campbell testified that he learned that appellant was involved with ADAPCP sometime after the operation on appellant had begun and certainly after the first transaction had been completed. The undercover agent working with Nolte testified that he did not know of it until the day of trial.

only that he used it. Still, Nolte was confident that appellant would oblige, due to his eagerness for crack.

Upon his initial interview with CID, Nolte was qualified by CID officials as a "Registered Source." According to a CID agent,[4] the term, "Registered Source," implies

> a person who gives us information, and who we don't let anybody [know] who "he" is, or the unit he is in or his name, or anything.

Without further ado, Nolte was immediately paired up with an undercover agent and the two were sent out together to attempt a purchase from appellant. There was no opportunity for Nolte to contact appellant in advance; Nolte was never separated from the agent; and Nolte could not have known beforehand that the CID was exclusively interested in cocaine dealers.

Observing appellant's car near "Cav Country," Nolte waved appellant down. According to both the agent and Nolte, Nolte introduced the agent

> as a student from the University of Nebraska ... and he asked ... [appellant] if he could sell ... [the agent] some crack cocaine, for the road trip back to Nebraska; and he said, sure no problem....

Virtually instantly, appellant agreed, hopping into Nolte's car and directing the agent and Nolte to a location in nearby Clarksville, Tennessee. At the site, appellant got out of the car, with money supplied by the agent, and walked out of view; Nolte and the agent remained in the car. A short time later, appellant returned with a quantity of crack cocaine, which he turned over to the agent.

Appellant conceded at trial that he was not expecting Nolte on the 24th. His estimates of the length of the conversation that led to his getting into Nolte's car for the purpose of effecting a drug transaction careened from "[j]ust a matter of seconds" to "approximately fifteen to twenty minutes" to "maybe five minutes." Further, during the first transaction, unbeknownst to Nolte and the agent, appellant "ripped off" the agent, keeping approximately half of the purchased crack for himself, according to appellant's own trial testimony.

After the first transaction, the CID wanted to see if appellant would deal in larger quantities—and if he would sell to servicemembers. Therefore, they asked Nolte to try to set up another deal, and they told him to change his story by telling appellant that the same undercover agent was actually a soldier. Knowing that the change of story would be a problem, Nolte ad libbed.

The following colloquy, which occurred during defense cross-examination of Nolte, sets the stage:

> Q. Now, the second deal, you embellished your story a little bit; why did you do that?
>
> A. The CID told me to change it so—make it look like ... [the agent] was in the Army. They said do whatever you have to do to make it look like he was in the Army.
>
> Q. When you changed your story, did you know you were going to have a little bit of trouble with the accused—
>
> A. I knew I'd have to lie my butt off, to convince him.
>
> Q. So you threw in some of those other tidbits?
>
> A. There were a lot of tidbits.

Among these "tidbits," Nolte, without the knowledge of or approval from CID, took it upon himself to suggest to appellant that "we can take him [the agent] for a lot of money, you know, you take what you want, take some money out of it, whatever you want, you know, just—let's just set him up." Nolte also indicated that appellant could "pinch some coke" for himself.

The second transaction occurred on October 5, 1989. Some days earlier, according

---

4. According to CID Regulation 195–15 (1 November 1987), a "registered source" is "An individual, recruited, targeted and/or controlled by a special agent to confidentially gather intelligence information for USACIDC personnel. Registered sources are always considered agents of the Government and their identity will be protected." Para. 1–2d.

to his testimony, Nolte had already broached the possibility of a second transaction between appellant and the agent, floating the agent's new cover story and offering the aforementioned "tidbits." Appellant, reportedly, was leery and noncommittal. Then, for a few days, Nolte was not able to follow-up on the transaction because he could not find appellant. When Nolte next caught up with appellant, on October 5, 1989, Nolte reproposed the deal; this time appellant agreed. Again, appellant conceded in his testimony that he had not been expecting Nolte on the 5th.

Initially, the second transaction transpired much as had the first. Once more, as he acknowledged in his own trial testimony, appellant held back a considerable portion of the crack for himself. This time, however, before turning over the remainder to the agent, appellant conspicuously took off yet another piece, which he proceeded to smoke in the presence of the agent and Nolte. Afterward, on the way home, appellant relentlessly pestered the agent into giving him even more of the agent's drugs.

As the agent described it:

On the way back to Fort Campbell, he [appellant] was really persistent on me giving him crack, and, for me to smoke with him. Neither one can I do, or will I; but his persistence was so strong, to keep him from thinking that I'm CID or anything, to keep my covert status undercover, I felt it necessary at that time, to give him a chip of crack, to keep him off my back from smoking with him. Okay, so what I did, I reached down in the cellophane wrapper and found the smallest piece, chip crack, that I could find, and I handed it to him; and that pretty much took care of the problem with him hounding me about smoking crack with him, or me giving him crack.

Upon their return to Fort Campbell, appellant was apprehended. On his person was discovered a quantity of crack cocaine and one of the marked $20 bills provided by the CID agent. At the court-martial, appellant confirmed distributing drugs and retaining quantities of drugs on both occasions, and smoking crack in the presence of the agent and Nolte on the second occasion.

One obvious obstacle appellant had to overcome in his entrapment defense was the logical inference from his alacrity in assenting to the unexpected request to purchase drugs. His tack was to describe how, for weeks or months, Nolte had "persistent[ly]" been "hammering" and "badgering" him "about trying to get back into the drugs." According to appellant, "Nolte always talked about bringing somebody, trying to rip somebody off...." Not surprisingly, given his lack-of-predisposition claim, appellant denied that he and Nolte had actually collaborated in drug transactions prior to the September 24 deal. Nevertheless, according to appellant, when that serendipitous moment arrived, appellant was virtually helpless to resist, which was the result of Nolte's lengthy preparation—and, of course, appellant's own addiction.

Another theme of appellant's defense was government overreaching in the transactions themselves. In this regard, appellant sought to portray Nolte's conduct (the agent's "agent") as particularly reprehensible. There is no doubt that Nolte, without authority, *prior to the second transaction*, suggested to appellant that he might "pinch" some of the crack for himself. In addition, there is no doubt that, *during the second transaction*, the agent reluctantly permitted appellant to take a piece of crack to avoid compromising the agent's cover. As appellant plainly recognized, however, his hopes for a lack-of-predisposition conclusion rose or fell with the first transaction less than 2 weeks earlier. The problem here was that Nolte had no opportunity prior to the first transaction to suggest any improprieties, and the agent never left Nolte's side during that entire transaction.

These obstacles notwithstanding, appellant nevertheless claimed that Nolte in fact invited appellant to pinch cocaine as an inducement to undertaking *the first transaction*. This Nolte conveyed, according to

appellant, not by words but by secretive looks and gestures.

Thus, as appellant asserted on cross-examination concerning those seconds of conversation during which the first deal was struck:

A.... I knew when I saw Nolte, and he gave me that look, that I knew that, you know, I would get some crack out of the deal.

Q. You knew that you were going to get some crack out of the deal?

A. Yes, sir, I mean it is—it is just something—that people that you get high with, there is a certain way they can look at you, and you just know, you just know.

Q. So just this little—little look he have you, told you, I'm going to get something out of this?

A. Yes, sir.

Q. Okay, nobody said you were going to get anything out of it?

A. No, sir.

Q. They didn't promise you any crack?

A. Well, it was said—it was established between I and Nolte by just gestures.

Q. Just by gestures?

A. Just gestures....

Nolte stoutly denied sending such signals; and the agent did not observe it.

Two pages later in the record, with cross-examination continuing along the same lines, trial counsel led appellant into one of those colloquies that appellant, in retrospect, might have wished to have back:

Q. Okay, and you had never done this before, but you just knew in a matter of seconds, that that is what you were going to do?

A. No, I've done it a lot of times before, sir.

Q. Oh, you have done it a lot before?

A. Yes, sir.

Q. Okay, with Nolte?

A. With different people, sir.

Q. So you had ripped off a lot of people that way?

A. Yes, sir.

### Analysis

Assuming appellant was addicted to crack cocaine, as he indicated he was and as all evidence tends to suggest, the debate over whether he was "predisposed" to transfer crack cocaine approaches the metaphysical. Addiction virtually assumes a predisposition to acquire; and, as appellant instantly recognized, the proposed transaction presented him an opportunity to "pinch" some for himself. Ergo, he was predisposed to transfer.

In any event, as previously noted, the entrapment defense is conceived of as a means of protecting "the unwary innocent" from government implantation of the criminal design. *Sherman v. United States* and *United States v. Russell,* both *supra* at 360. It is clear from this record that appellant was no "unwary innocent." It was not the Government, after all, that implanted appellant's craving.[5] Nothing in the law of entrapment forbids the Government from merely asking someone to sell drugs. If that person happens to be an addict who leaps at the chance, that does not transform the police into malefactors.[6] That is called good police work.

---

5. Even crediting Nolte as implanter, that would have occurred long before he had any connection with law enforcement.

6. Appellant's contention that the police conduct in the instant case violated the Due Process Clause of the Constitution is without legal authority. The possibility of a due process entrapment theory was discussed in *United States v. Russell,* 411 U.S. 423, 93 S.Ct. 1637, 36 L.Ed.2d 366 (1973). That case dealt with the permissible degree of involvement by law enforcement agents in the criminal enterprise. A federal agent there had supplied Russell and others with "an essential ingredient in the manufacture of methamphetamine, in return for one-half of the drug produced." 411 U.S. at 425, 93 S.Ct. at 1639.

The Court of Appeals had reversed Russell's conviction on the basis of "fundamental concepts of due process ... [which] evince the reluctance of the judiciary to countenance 'overzealous law enforcement.'" 459 F.2d 671, 674 (9th Cir.1972) (footnote omitted), quoting *Sher-*

The instant record is replete with evidence of appellant's pre-existing disposition and of the Government's lack of overreaching prior to the first transaction. The factfinder was entirely within its province in rejecting appellant's entrapment claim. *Jackson v. Virginia, supra.*

### The Statutory/Regulatory–Bar–to–Prosecution Claim

■ As noted by the Court of Military Review, appellant was enrolled in the Army Alcohol and Drug Abuse Prevention and Control Program (ADAPCP). Indeed, according to ADAPCP personnel, appellant was a rare "genuine self-referral," meaning that he spontaneously turned himself in to his own first sergeant and admitted his drug-abuse problem. Appellant was formally enrolled in an out-patient program on July 19, 1989, over two months before the first charged drug transaction. Further, it is uncontroverted that Nolte was aware of appellant's involvement in the program but he did not reveal that information to CID officials; and they, in fact, were unaware of it at the time of the charged transactions.

Appellant's position starts from the proposition that the Government as a whole and the military in particular have recognized the desirability of rehabilitating drug abusers. To that end, appellant notes, the Government as a whole and the military in particular have enacted or adopted various measures intended to advance the cause of drug rehabilitation. Further, appellant advances the merits of having an effective drug rehabilitation program. Finally, ap-

pellant argues that the governmental action in this case violated certain of the Government's own regulations and had the effect of undermining the laudable policies they serve. Therefore, appellant concludes, we should denounce the police action in this case and immunize appellant from prosecution. Before this Court, as he did at the court-martial and the Court of Military Review, appellant cites a miscellany of statutory and regulatory provisions.

Having no role in the public policy aspects of the debate, Article 67(c) (1989), we confine ourselves to an examination of any Constitutional, statutory, or regulatory provisions cited by appellant or otherwise applicable. If any were violated, we must then determine whether they established an exclusionary rule or a bar to prosecution. *United States v. Caceres,* 440 U.S. 741, 99 S.Ct. 1465, 59 L.Ed.2d 733 (1979).

Initially, appellant cites 42 USC § 290ee–3(a) for the proposition that "Congress enacted legislation that protects the confidentiality of the patient in a federally-assisted drug treatment program." Final Brief at 9. That provision states:

Records of the identity, diagnosis, prognosis, or treatment of any patient which are maintained in connection with the performance of any drug abuse prevention function conducted, regulated, or directly or indirectly assisted by any department or agency of the United States shall, except as provided in subsection (e) of this section, be confidential and be disclosed only for the purposes and un-

---

man v. United States, 356 U.S. 369, 381, 78 S.Ct. 819, 825, 2 L.Ed.2d 848 (1958)(Frankfurter, J., concurring in the result).

The Supreme Court reversed the Court of Appeals, rejecting the claim that the police involvement or deception constituted a defense. Rather, the majority focused on the predisposition of the accused, which was conceded. 411 U.S. at 436, 93 S.Ct. at 1645.

In passing, the majority opinion noted:

While we may some day be presented with a situation in which the conduct of law enforcement agents is so outrageous that due process principles would absolutely bar the government from invoking judicial processes

to obtain a conviction, *cf. Rochin v. California,* 342 U.S. 165, 72 S.Ct. 205, 96 L.Ed. 183 (1952), the instant case is distinctly not of that breed.

411 U.S. at 431–32, 93 S.Ct. at 1642–43. *Rochin,* of course, was the case in which officers forced an emetic into the accused's stomach to cause him to vomit evidence he had swallowed.

Thus, the due process entrapment arises only in the context of shocking police abuse of an accused. In the instant case, the law enforcement agents merely asked him if he wanted to deal, and he did. There was thus no abuse or mistreatment whatever.

der the circumstances expressly authorized under subsection (b) of this section.

First, there is not the slightest indication in this record that any records of any drug-abuse-prevention function were ever disclosed to anybody. Second, subsection (e) apparently exempts the prohibitions of 42 USC § 290ee–3(a) from, *inter alia*, "any interchange of records ... within the Armed Forces." 42 USC § 290ee–3(a) provides appellant no relief.

Next, appellant cites 42 USC § 290ee–3(c) for the proposition that Congress was concerned about "the inherent conflict between the short-term aims of law enforcement personnel and an effective rehabilitation effort." Final Brief at 10.

That provision states:

> Except as authorized by a court order granted under subsection (b)(2)(C) of this section, no record referred to in subsection (a) of this section may be used to initiate or substantiate any criminal charges against a patient or to conduct any investigation of a patient.

Again, insofar as this record discloses, no record of any drug-abuse-prevention function was "used to initiate or substantiate" any charge "or to conduct any investigation." Thus, even if 42 USC § 290ee–3(c), referencing as it does the records indicated in 42 USC § 290ee–3(a), applied to the Armed Forces, it would succor appellant no relief.

Next, appellant cites 42 C.F.R. §§ 2.17, 2.35, 2.65, 2.67; para. 2–16(a), Army Regulation (AR) 600–85; para. 3–7, AR 195–2; and para. 2–5(b)(5), CID Regulation 195–15, to demonstrate how "executive agencies have proscribed police intrusions into the rehabilitative process." Final Brief at 11. But this reliance is misplaced.

Public Health Service, Department of Health and Human Services, 42 C.F.R. § 2.17, "Undercover agents and informants,"[7] provides:

(a) *Restrictions on placement.* Except as specifically authorized by a court order granted under § 2.67 of these regulations, *no program may knowingly employ, or enroll as a patient, any undercover agent or informant.*

(b) *Restrictions on use of information. No information obtained by an undercover agent or informant,* whether or not that undercover agent or informant is placed in a program pursuant to an authorizing court order, *may be used to criminally investigate or prosecute any patient.*

(Emphasis added.)

For purposes of this regulation, an "informant" is defined as
an individual:

(a) Who is a patient or employee of a program or who becomes a patient or employee of a program at the request of a law enforcement agency or official: *and*

(b) *Who at the request of a law enforcement agency or official observes one or more patients or employees of the program for the purpose of reporting the information obtained to the law enforcement agency or official.*

42 C.F.R. § 2.11 (emphasis added).

An "undercover agent" is defined as
an officer of any Federal, State, or local law enforcement agency *who enrolls in or becomes an employee of a program for the purpose of investigating a suspected violation* of law or who pursues that purpose after enrolling or becoming employed for other purposes.

*Id.* (emphasis added).

Given the definitions, it is clear that these regulations entitle appellant to no relief. First, 42 C.F.R. § 2.17(a) is plainly inapplicable, as there is not a scintilla of evidence that the drug-abuse program "knowingly ... enroll[ed] ... any undercover agent or informant." Second, 42 C.F.R. § 2.17(b) is inapplicable, as the CID agent was not an "undercover agent" within the meaning of these provisions. He did

---

7. These regulations apply generally to the Armed Forces, except where otherwise limited.

42 C.F.R. § 2.12(c)(2).

not "enroll[ ] in or become[ ] an employee of ... [the] program." Title 42 C.F.R. § 2.11.

Third, Nolte was not an "informant" within the meaning of these provisions. Admittedly, there is evidence that, *after* the first transactions was completed, Nolte attended a 3–day ADAPCP "counseling" session. However, there is no indication (1) that Nolte became "a patient ... at the request of a law enforcement official" or (2) that he "observe[d]" any patient in "the program for the purpose of reporting" information. Indeed, there is no indication that he ever encountered appellant in connection with the program. As this record makes quite clear, any judicially pertinent "information" that Nolte provided was acquired prior to or wholly outside of any "program." Moreover, any judicially pertinent information Nolte had to offer was observed simultaneously by and reported by the CID agent. 42 C.F.R. § 2.17 provides appellant no relief.

42 C.F.R. § 2.35 relates to authorized disclosures of patient information "to those persons within the criminal justice system which have made participation in the program a condition of the disposition of any criminal proceedings...." 42 C.F.R. § 2.35 has no applicability to the facts of this case.

42 C.F.R. § 2.65 relates to applications for judicial orders "authorizing the disclosure or use of patient records...." 42 C.F.R. § 2.65 has no applicability to the facts of this case.

42 C.F.R. § 2.67 relates to applications for judicial orders "authorizing the placement of an undercover agent or informant in a program as an employee or patient...." 42 C.F.R. § 2.67 has no applicability to the facts of this case.

Next under consideration is AR 600–85, "Alcohol and Drug Abuse Prevention and Control Program" (21 October 1988), the iteration then in effect of the Army's comprehensive regulation establishing its drug rehabilitation program (ADAPCP). For legal purposes, the crux of the regulation centers around paragraphs 6–3 to 6–5, the "Limited Use Policy." In essence, the Limited Use Policy prohibits *disclosure of a variety of information flowing from a servicemember's entry into and participation* in the program. For example, except under circumstances not present herein, the following matters may not be disclosed: the results of ADAPCP-related urinalysis tests; the fact of a servicemember's self-referral to the program; admissions and other information about the servicemember's personal drug abuse occurring prior to the initial referral, made as part of the servicemember's initial entry into the program; admissions about the servicemember's prior drug abuse, made to physicians or ADAPCP counselors during scheduled interviews; and admissions made while receiving emergency care for possible drug overdose, unless such treatment was the result of apprehension by law enforcement authorities.

In addition, the regulation prohibits anyone subject to the jurisdiction or control of the Secretary of the Army ... [from] divulg[ing] any information or record of identity, diagnosis, prognosis, or treatment of any client. This includes any information which is maintained in connection with alcohol or other drug abuse education, training, treatment, rehabilitation, or research, except as authorized ... [in subparagraphs not pertinent here].

Para. 6–9.

There is no contention in appellant's case that any of the foregoing ADAPCP information relating to appellant was ever revealed to anybody outside the program.

The Limited Use Policy is itself substantially limited. For example, it "does not prevent the [ADAPCP] counselor from revealing, to the appropriate authority [including the servicemember's commander], knowledge of certain illegal acts," including "acts which may have an adverse impact on or compromise mission, national security, or the health and welfare of others.... Likewise, information that the client presently possesses illegal drugs or that the client committed an offense while

under the influence of illegal drugs or alcohol is not covered under this policy." Para. 6-4*b*, AR 600-85.

Moreover, the ADAPCP regulation specifically recognizes the legitimacy of the following law enforcement functions:

a. Eliminate the supply of illegal drugs.

b. Identify and apprehend individuals who illegally possess, use, or traffic in drugs.

c. Prevent alcohol and other drug-related crimes, incidents, and traffic accidents.

Para. 2-14.

Among other things, the regulation charges senior commanders to

Develop and implement procedures to suppress drug trafficking, misuse, or abuse and to reduce crimes and traffic accidents resulting from alcohol and other drug abuse.

Para. 2-15a (1).

Regarding the "Law enforcement relationship to the ADAPCP" specifically, the regulation provides:

It is Army policy to encourage voluntary entry into the ADAPCP. Military police, Criminal Investigation Division (CID) special agents, and other investigative personnel *will not solicit information from clients in the program,* unless they volunteer to provide information and assistance....

Para. 2-16a (emphasis added).

Focusing on this latter provision of the regulation, appellant contends that his prosecution for the offenses he committed at the request of undercover law enforcement operatives should have been barred. We disagree. As we noted in both *Cooper* opinions, any material derived from an unauthorized release of ADAPCP *information* would be barred from initial prosecutorial use; and any information obtained by an unauthorized law enforcement penetration of an ADAPCP program would meet the same fate. However, no such compromise of ADAPCP occurred here. The CID was not after "information."

Para. 2-16a. They wanted dealers, and they went to the streets to find them. Their aim was to "Eliminate the supply of illegal drugs" and to "Identify and apprehend individuals who illegally possess, use, or traffic in drugs." Para. 2-14. Appellant took the bait. The ADAPCP regulation, prohibiting solicitation of information from ADAPCP clients, was not violated.

In addition, as we indicated in *Cooper* I, 33 MJ at 358, we will not condone the targeting of ADAPCP clients. The instant case, however, was clearly not a targeting of an ADAPCP client. Appellant's ADAPCP connection had nothing to do with his selection since the CID agents did not at the time know appellant was involved in the program, and the source identified appellant because he was the only person the source knew who was involved with cocaine. Thus, appellant's connection with ADAPCP was not a factor in this otherwise unexceptional street transaction. Nothing in AR 600-85 stays the Government from prosecuting when routine drug-suppression operations turn up a willing drug dealer who happens to be in a program. The ADAPCP regulation and the credibility of the ADAPCP program were not compromised in this case.

Appellant next cites two more regulatory provisions which add little to AR 600-85. Paragraph 3-7, AR 195-2, "Criminal Investigations: Criminal Investigation Activities," states:

In compliance with the Army's ADAPCP policy, CID will investigate participants in ADAPCP for controlled substance offenses only if the offense occurred after entry into the program or if the participant had been identified as a suspect or subject prior to the time of entry into the program. *Participants in ADAPCP will not be knowingly approached by CID special agents for the purpose of soliciting information about controlled substances distribution* unless the participant voluntarily offers to provide such information. (See AR 600-85).

(Emphasis added.)

As Chief Judge Sullivan aptly noted in *Cooper I,* 33 MJ at 359, paragraph 3-7

"does not apply to offenses occurring after entry into the program"; and "the prohibited conduct ... is the gathering of information, not the conducting of a sting' operation."

The final regulation cited by appellant is CID Regulation 195–15, "Criminal Investigation: USACIDC SOURCE PROGRAM" (Nov. 1, 1987). Paragraph 2–5b(5) provides:

> The Alcohol and Drug Abuse Prevention and Control Program (ADAPCP) prohibitions and restrictions are defined in AR 600–85. USACIDC special agents and other investigative personnel, to include sources, *will not solicit information* from participants in ADAPCP. Information which is volunteered is acceptable, as long as it is not obtained within an ADAPCP facility or in such a manner as to jeopardize the safety of the source or in a way which compromises the credibility of the ADAPCP. No covert agents will enroll or infiltrate ADAPCP facilities for the purpose of law enforcement activities. The USACIDC special agent must know if their open/confidential/registered source(s) are ADAPCP participants.

Apart from the specific mention of sources, who would undoubtedly be included by agency principles under the other provisions, this paragraph adds nothing to the ADAPCP regulation.

In sum, we would hold that the cited regulations were not violated by the type of law enforcement activity in this case. Under the circumstances, we would conclude that these regulations contain no bar to prosecution of appellant and no exclusionary rules bar use of evidence obtained against him. Thus, it is not even necessary for us to resolve formally whether these regulations are "mandated by the Constitution or federal law," which is a prerequisite to transforming a government regulation into an exclusionary rule. *United States v. Caceres*, 440 U.S. at 749, 99 S.Ct. at 1470.

Had there been willful, intentional or repetitive police misconduct, occasioned by breaches of the ADAPCP Limited Use Policy, either through the unauthorized release of information, police penetration, or police targeting of ADAPCP clients, we would be more likely to provide relief, as soldiers are clearly entitled to rely on the promises and assurances of confidentiality afforded through that program. *See Bank of Nova Scotia v. United States*, 487 U.S. 250, 259, 108 S.Ct. 2369, 2375–76, 101 L.Ed.2d 228 (1988). Furthermore, it fairly goes without saying that any police attempt to lure a recovering addict back into addiction would amount to criminal action in itself. *See* n. 6, 38 MJ at 364. As this record makes clear, however, the CID was the buyer of drugs, while appellant was the provider. Furthermore, it is clear from AR 600–85 that the ADAPCP program was never intended to be a sanctuary for all of a soldier's past, present, or future crimes. A soldier in the program who gets caught up in an independent police action is not immunized.

Under the circumstances of this case, we would hold that there was no Constitutional, statutory, or regulatory bar to prosecution or exclusion of evidence. Appellant's attempt to conflate his regulatory-violation claim with a Due Process violation is equally unavailing. See n. 6, *supra*.

These conclusions notwithstanding, we are extremely conscious of the difficult and fragile nature of the addiction-recovery process, especially for those addicted to crack cocaine. The testimony of the director of the Fort Campbell ADAPCP clinic was particularly powerful in this regard. She noted that Fort Campbell in particular and the Army in general simply did not have the residence facilities to deal with crack-cocaine addiction. Further, she testified that crack addicts in the early stages of their recovery have so little power to resist any temptation to use crack that it is virtually routine for recovering addicts to relapse occasionally during even a successful recovery process. Thus, although we are satisfied that the sanctity of the ADAPCP *program* was not violated, there can be no serious dispute that *appellant's* recovery was not aided by the police action.

This unfortunate consequence, however, does not undermine the legitimacy of the police action.

What it does is raise a question about the *wisdom* of the exercise of the prosecution function, versus either further medical treatment or administrative separation. However, that choice is plainly a matter of prosecutorial discretion, not judicial discretion. We have no ombudsman's override of that decision, however much we may agree or disagree with it. Further, we are mindful that a record of trial often contains but a mere slice of the total quantum of information known about an accused. Thus, even if we had power to review a decision to prosecute, we are not in position to do so. Even now, nothing forbids appropriate executive authorities from re-examining the wisdom of the initial decision to prosecute.

Under our purview, however, Judge CRAWFORD and I would affirm the decision of the United States Army Court of Military Review.

SULLIVAN, Chief Judge:

For the most part, I agree with Judge Cox that the decision below as to the distribution specifications should be affirmed. However, I continue to adhere to my position in United States v. Cooper, 33 MJ 356, 359 (CMA 1991), and United States v. Cooper, 35 MJ 417, 426 (CMA 1992), that the Government cannot disassociate itself from the conduct of its informants or operatives. See generally Sherman v. United States, 356 U.S. 369, 375, 78 S.Ct. 819, 822, 2 L.Ed.2d 848 (1958).

In United States v. Cooper, 33 MJ at 360, I wrote that "[i]f the government informant had preyed on appellant's addiction to induce him to commit the crime of using cocaine, my judgment [that the defense of entrapment was unavailable to the defendant] would be different in this case. See generally Rochin v. California, 342 U.S. 165, 72 S.Ct. 205, 96 L.Ed. 183 (1952)." Similar to Sergeant First Class Cooper, appellant was charged with and found guilty of two specifications of wrongfully distrib-

uting cocaine, in violation of Article 112a, Uniform Code of Military Justice, 10 USC § 912a. However, unlike Cooper, appellant was further charged with and found guilty of one specification of wrongfully *using* cocaine, also in violation of Article 112a.

The sting operation against appellant was intended to apprehend him in the process of selling cocaine. On September 24, 1989, appellant sold some cocaine to an agent of the Criminal Investigation Command (CID). On October 5, 1989, appellant again sold some cocaine to the agent. However, during this second transaction, appellant smoked some cocaine in the presence of the CID agent and Private Nolte, the government informant.

■ The record in this case uncontrovertedly established that Nolte offered appellant drugs for his use as an inducement for the second sale. Admittedly neither Nolte nor the CID agent smoked cocaine with appellant, and the CID agent testified that he provided appellant with cocaine upon appellant's insistence but only in an effort to maintain his undercover identity. Nevertheless, the following dicta from the Tenth Circuit in United States v. Harris, 997 F.2d 812, 818 (1993), expresses my view on these facts:

> [A]ny rule [promulgated by a court] that permits unlimited sales of narcotics to known addicts would ... lack merit. At a certain threshold, the government's conduct would violate due process. For instance, we speculate that if a government agent entered a drug rehabilitation treatment center and sold heroin to a recovering addict, and the addict was subsequently prosecuted for possession of a controlled substance, the outrageous government conduct defense might properly be invoked.

In this light I would set aside appellant's conviction for use of narcotics in this case.

WISS, Judge:

For the reasons set out by Chief Judge Sullivan, I agree with him that the conviction for using cocaine should be set aside. I do agree with Judge Cox, however, in

affirming the two convictions for distribution of cocaine, though not on the rationale expressed in his opinion.

Once again, *see United States v. Cooper*, 35 MJ 417, 426 (1992)(Gierke and Wiss, JJ, dissenting), this Court is presented with a record of trial that reflects police work of a quality that does nothing to add credit to the admirable efforts of most law enforcement officers. Once again, a court-martial was offered two hopelessly opposed stories—at least one of which was pure cock-and-bull—and was charged to find truth in the mire. Once again, the majority regrettably passes on an opportunity to make clear that this Court will not and must not become a partner in police operations so unseemly that it is difficult to determine who is doing more damage to the social fabric—the accused or the police.[1]

As to the first charged distribution, I concur in the result reached by the majority here for one reason only: The members impliedly (in discarding the entrapment defense) and the Court of Military Review expressly (in stating that appellant had agreed to the first transaction "without any inducement" from Nolte—34 MJ 846, 847) rejected appellant's contention that Nolte had used cocaine as the carrot to induce a known cocaine addict to commit a crime that Nolte had no reason on earth to think that the addict otherwise would commit. Notwithstanding the fact that I am nearly at a loss to comprehend the logic of this conclusion,[2] both the court-martial

members and the Court of Military Review were within their powers to find Nolte's story credible, so I must accept it for purposes of this appeal. *See United States v. Whittle*, 34 MJ 206, 209 (CMA 1992).

So that I may not be misunderstood, however, let me say forthrightly: If the findings of fact were less conclusive in this regard as to the first transaction and, thus, less restrictive on this Court, my conclusion would be much different. It may well be that, under certain circumstances, distribution of drugs by a law enforcement agent to a known addict may not be outrageous. *See United States v. Harris*, 997 F.2d 812, 817–18 (10th Cir.1993). I do not believe, however, that those circumstances include targeting a particular individual (as opposed to throwing out a net in "a sting operation" and seeing who gets caught, *see United States v. Tatum*, 36 MJ 302 (CMA 1993)) who the agent knows is a drug addict *and initiating an offer of drugs to the addict as the reward for committing a crime that, otherwise, the agent has no reason to surmise that the target would commit.* I believe that that conduct would be coercive to the point of being "outrageous" as a matter of legal due process, *see United States v. Russell*, 411 U.S. 423, 93 S.Ct. 1637, 36 L.Ed.2d 366 (1973); *Sherman v. United States*, 356 U.S. 369, 78 S.Ct. 819, 2 L.Ed.2d 848 (1958); *United States v. Cooper*, 35 MJ at 429–30; *see also United States v. Whittle, supra* at 209.[3]

1. Obviously, I do not join Judge Cox's characterization of such methods as "good police work." 38 MJ at 364.

2. Judge Cox acknowledges that Nolte blatantly promised cocaine as the reward for the second transaction but notes the evidentiary dispute over whether Nolte used it as inducement for the first transaction. While, as I indicated, I accept the restriction on this Court to the findings below that accepted Nolte's testimony in this regard, I cannot help but wonder where is the logic to that conclusion. The scene: Out of the blue, Nolte approaches an acquaintance who is a cocaine addict, asks him to distribute cocaine (for the first time ever, to his knowledge), does not promise money as a reward (there is no dispute about that), does not promise cocaine to feed his habit as a reward, and the acquaintance does so with little or no coaxing.

*Something* led appellant to distribute cocaine to Nolte. It was not the promise of money; it was not the pitiful pleas of a friend in drug distress; it was not *anything*, according to the Government's version. Does this make sense—when Nolte admitted he had to promise cocaine and "lie his butt off" to induce the second transaction?

3. The Chief Judge agrees with this viewpoint if the crime that is induced is drug use. I believe, however, that the essence of the outrageous denial of due process is not in the nature of the crime induced but, rather, in the nature of the inducement. It would be shocking to the conscience of the law if, in the name of law enforcement, agents of the government created a crime by feeding a drug addict's sickness as reward for the addict's practically inevitable agreement to commit some particular crime.

It also would be repulsive as a matter of human mores [4]—and more than a little frightening as a matter of societal expectations of police standards.

By Nolte's own acknowledgement, on the other hand, the *second* transaction *was* induced by the promise of drugs as the reward. By then, however, appellant's propensity to distribute already was established by the first transaction, so an entrapment defense in the usual sense was precluded. Moreover, in this context of one purportedly clean distribution already having occurred (which I consider a critical fact), I am not persuaded that the Government either created the crime of that second distribution or that the Government's inducement was so coercive as to be outrageous.

Before concluding, I must pause to comment on one especially disturbing aspect of Judge Cox's opinion. Although a majority of this Court has disavowed it, my two colleagues who fully embrace that opinion appear to continue of the view that was suggested in the lead opinion of *United States v. Cooper*, 33 MJ 356, 358 (CMA 1991)(Cox, J.), and that was candidly expressed in the lead opinion of *United States v. Cooper*, 35 MJ at 424 (Crawford, J., with concurrence of Cox, J.), that "registered sources" of the Criminal Investigation Command (CID) and badge-carrying CID agents are independent from each other, so that actions and knowledge of the former are not attributable to the latter.[5] This view disturbs me, first, because it is a legal myth: It is contrary to paragraph 1–2d, CID Regulation 195–15 (1 Nov. 1987) ("Registered sources are always considered agents of the Government ...."), and it blatantly (though silently, without so much as acknowledging the difficulty) flies in the

face of precedent of the Supreme Court of the United States (*e.g., Sherman v. United States,* 356 U.S. at 375, 78 S.Ct. 822: "The Government cannot make such use of an informer and then claim disassociation through ignorance.").

This view disturbs me, second, because it is outright judicial encouragement to badge-carrying agents to consciously maintain total ignorance of the activities of non-badge-carrying agents—registered sources. The inevitable result would be that people—who most usually are, at least, as low-life as their targets—could run around, untethered to their ironically mislabelled controllers, doing anything to anyone they please, without any of the dirt splashing onto the white hats of the CID agents—all in the name of "law enforcement."

Fortunately, a clear majority of this Court has forthrightly rebuked such a view of appropriate law enforcement which otherwise would perpetuate a shady auxiliary police force that would be free from all of the restraints that civilized society places on its official police. Hopefully, although that clear majority does not appear in the *lead* opinions of either of our *Cooper* decisions cited earlier or this one, the law enforcement authorities in the military will get the word: If their registered sources know something, then they, too, know it as a matter of law.

GIERKE, Judge:

I agree with Judge Cox with respect to Issue II, but I disagree with respect to his treatment of Issue I. I would hold that the second distribution and the wrongful use of cocaine specifications (specifications 2 and 3 of the Charge) should be set aside on the

---

**4.** As the Court of Military Review concluded concerning this agent of the United States Army: "Nolte knew that appellant was a cocaine addict, was 'strung out,' and would be an easy set-up." 34 MJ 846, 847 (1992). I find nothing about this shooting-fish-in-a-barrel attitude toward crime creation that measures up to the standards of conduct that society expects of its police.

**5.** *Compare United States v. Cooper,* 33 MJ 356, 359 (CMA 1991)(Sullivan, C.J., concurring in the

result); *id.* at 362–63 (Everett, S.J., dissenting); *United States v. Cooper,* 35 MJ 417, 426 (Sullivan, C.J., concurring in part and in the result); *id.* at 427 (Gierke and Wiss, JJ, dissenting); and 38 MJ at (370) (Sullivan, C.J.), *with United States v. Cooper,* 33 MJ at 358 (Cox, J.) and *United States v. Cooper,* 35 MJ at 424 (Crawford, J.), and *id.* at 426 (Cox, J., concurring).

grounds of outrageous government conduct amounting to a violation of due process. A government agent (Nolte) offered appellant drugs, knowing that he was an addict in a drug treatment program, for the sole purpose of inducing him to distribute drugs so that he could be apprehended and prosecuted. This is law enforcement run amuck. I find it outrageous.

In *United States v. Russell*, 411 U.S. 423, 93 S.Ct. 1637, 36 L.Ed.2d 366 (1973), the Supreme Court recognized that a violation-of-due-process defense based on outrageous government conduct would warrant a dismissal of charges. *Id.* at 431–32, 93 S.Ct. at 1642–43. In *Hampton v. United States*, 425 U.S. 484, 96 S.Ct. 1646, 48 L.Ed.2d 113 (1976), a majority of the Court recognized that a due-process-outrageous-conduct defense is available regardless of a defendant's criminal predisposition. *Id.* at 491–500, 96 S.Ct. at 1650–55. *See United States v. Vanzandt*, 14 MJ 332, 342 (CMA 1982). "The standard to be applied is whether the government's conduct violates 'fundamental fairness' and is 'shocking to the universal sense of justice.'" *United States v. Miller*, 799 F.2d 985, 988 (5th Cir.1986).

While the Supreme Court has limited this Constitutional defense to only the most intolerable government conduct, it also created a standard with little guidance for its application. *See generally* Doucet, *United States v. Simpson and the Due Process Challenge of Outrageous Conduct*, 10 Geo. Mason U. L.Rev. 547 (1988). However, two nonexclusive factors generally underlie a finding of outrageous government conduct: 1) generation of new crime for the purpose of prosecution (as opposed to government agents merely involving themselves in an ongoing criminal activity); and 2) substantial government coercion to induce an accused to commit a crime. *United States v. Mosley*, 965 F.2d 906, 911–12 (10th Cir.1992). No one factor is necessarily determinative, but the totality of the circumstances must be considered to determine whether the conduct of government agents in each case reaches a demonstrable level of outrageousness. *See United States v. Bogart*, 783 F.2d 1428, 1438 (9th Cir.1986). *See also People v. Isaacson*, 44 N.Y.2d 511, 406 N.Y.S.2d 714, 378 N.E.2d 78 (1978).

Prior to any application of these factors to this case, the following facts are pertinent. The Government's registered source, Private Nolte, knew that appellant referred himself to the Army Alcohol and Drug Abuse Prevention and Control Program (ADAPCP), and he identified appellant for targeting to take advantage of appellant's drug addiction that previously led appellant to move from his apartment complex to the barracks and enroll in ADAPCP. Nolte's knowledge is attributable to the Government. *See Sherman v. United States*, 356 U.S. 369, 374–75, 78 S.Ct. 819, 821–22, 2 L.Ed.2d 848 (1958) (Government cannot make such use of an informer and then claim disassociation through ignorance).

Nolte knew appellant's addiction made him an "easy" target. Nolte testified that he told the CID that it would be "easy to get [appellant] because he is an addict and he could get it most anytime he wanted to." CID Agent Cooke testified that he was "not sure" whether Nolte told him that appellant "was an addict," but "he may have." Neither Agent Cooke nor Nolte had any prior knowledge that appellant was a drug dealer or had ever distributed drugs before, but they targeted appellant only on the basis that he had used drugs.

After their first purchase, the CID discovered that appellant was in the ADAPCP program. The Drug Team Chief, Chief Warrant Officer Watson, testified that one of his agents contacted appellant's unit commander to let him know they were "working drug deals" on appellant, and he was informed at that time of appellant's status in ADAPCP. Apparently, Agent Cooke's superiors left him in the dark about this discovery. Moreover, the discovery seemed to have no effect on the planning or execution of the second transaction.

According to Nolte, the CID wanted to make a much bigger buy from appellant

for the second transaction—kilos, if possible. Nolte informed them that he knew appellant "could not get kilos," so they told Nolte to "go ahead and set him up for what you think you can get." The CID also asked Nolte to "tell [appellant] whatever you got to tell him to make" appellant believe that Agent Cooke was "in the military." Nolte testified that, after appellant's initial resistance to make the second transaction, he told appellant he could take some money and/or "pinch some coke" if he went through with the deal. He claimed the "pinching" aspect was his idea, since CID agents told him "to make up any story [he] could think of, to make him believe that ... [appellant] could get his benefit out of this."

Applying the factors of crime creation and coercion to the instant case, several things are apparent. First, appellant was no "drug dealer" who had entered the ADAPCP program as a shield to continue the illegal sale of drugs, and the government agents had no reason to believe that he was doing so. No evidence was introduced that appellant had accumulated money or property, was able to obtain more than user quantities of cocaine, or possessed scales or other paraphernalia used in distributing drugs. For each distribution charged, appellant acted as a middleman, taking money provided by the agent to buy user amounts of crack cocaine from a dealer to return to the agent.

Secondly, the evidence shows that appellant was an addict in the early stage of a drug treatment program who had not yet developed the will power to resist outside temptations to satisfy his craving for cocaine.[1] *Cf. United States v. Cooper*, 33 MJ 356, 357 n.3 (CMA 1991)(accused required over 7 months of treatment before he was able to resist crack cocaine). Appellant thought he had escaped from his former drug environment by moving to the barracks; but that did not work very well, so he voluntarily entered a drug-treatment program. If appellant could learn to control his addiction as he had taken the first steps toward doing, he would have no further need to distribute to help feed his addiction. Thus, it is clear that the government agents were not infiltrating any ongoing illicit activity, but were actually creating a crime by taking advantage of appellant's addiction.[2] *See United States v. Russell*, 411 U.S. at 432, 436, 93 S.Ct. at 1643, 1645 (Court found it significant that the defendant's criminal enterprise was *already in progress* before any government agent appeared on the scene).

Third, Nolte had appellant targeted even though he knew appellant was a cocaine addict (but not a distributor) and self-referred to a drug treatment program. The significance of the fact that Nolte knew appellant was an ADAPCP patient is twofold: 1) appellant was an easy target who was not likely to be able to resist the allure of crack cocaine; and 2) appellant was making an attempt through enrollment in a government-sponsored program to overcome his addiction. Nolte took advantage of the addiction appellant was attempting to overcome by offering appellant a portion of the drugs in exchange for purchasing drugs for another.[3] In my book, that is

---

1. Nolte testified that after the first purchase, on the way back to the post, appellant "kept pestering" Agent Cooke to smoke or share some of the crack with him, but Agent Cooke "just held him off" and did not give him any. Appellant testified that he "kept" a portion of crack cocaine for himself prior to returning to the car. It is clear that appellant's motive in making the first distribution was to obtain some cocaine for himself.

2. The only evidence that implied that appellant had distributed drugs before came from appellant's candid admission that he had "ripped off" people (by stealing someone else's share of an illegal substance) in the past. However, there was *no* evidence suggesting that appellant was involved in these "rip offs" *after* he entered the drug treatment program prior to Nolte's approaching him. Appellant also testified that he used drugs only once after entering the program. On that occasion, he testified that he craved the drug so much, he just "left ... and got high." Accordingly, any "rip off" distributions to which he admitted would have occurred prior to this time.

3. In my opinion, the mere fact that the Government discovers that a rehabilitating drug addict is willing to make a purchase of drugs for an

much more reprehensible than what Judge Cox refers to as just an "otherwise unexceptional street transaction." 38 MJ at 368.

Finally, after appellant initially declined to participate in a second transaction, Nolte coerced appellant into arranging that transaction by promising him cocaine for his own use if he distributed it to Agent Cooke. This promise was kept by allowing appellant to receive and smoke cocaine *twice* in their presence after the second transaction. The result: charges and convictions for a second distribution *and* a wrongful use of cocaine. This was all done while CID agents either maintained ignorance in the matter or already had learned that appellant was an addict in a treatment program. Yet, they allowed Nolte, a person with a vested interest in getting appellant to distribute drugs at any cost (to minimize his own troubles with the law), free reign to set up a drug buy with a recovering addict.

What makes this even more egregious is the evidence indicating that the Government's main purpose for initiating the second transaction was to increase appellant's charges and enhance his punishment upon conviction. Aware that appellant was merely an addict who acted as a middleman during the first transaction, the CID nevertheless directed Nolte to set up another distribution for a larger amount of cocaine and to tell appellant whatever was necessary to convince appellant that Agent Cooke was actually in the military. Appel-

lant, an "easy target" and known drug rehabilitation patient, was then promised drugs to induce him to make a larger ($100.00) second purchase and delivery of drugs to someone he was told was in the military. This can hardly be described as an attempt to prevent further crime or protect the populace.

On this basis, I would hold that the Government's enticement of appellant, known to be an addict seeking treatment but not even suspected of being a dealer, to distribute and use drugs is "outrageous" enough to be a violation of due process. The Government's creation of a crime that otherwise would not likely have occurred, combined with the reprehensibly coercive tactic of offering drugs to a rehabilitating drug addict to induce him to distribute drugs, make the second distribution and use charges unconscionable to the point of being "outrageous." *Cf. United States v. Harris*, 997 F.2d 812, 819 (10th Cir.1993)("outrageous conduct" to rely on the defendant's "known addiction to carry out multiple [drug] transactions with the primary purpose of stacking charges"); *United States v. Twigg*, 588 F.2d 373 (3d Cir.1978) (drug manufacturing violated due process); *United States v. West*, 511 F.2d 1083, 1085 (3d Cir.1975) (conduct "intolerable" where government informant supplied defendant with narcotics and then introduced him to another government agent to whom to sell the narcotics).

agent at the agent's request does not give it a license to use any artifice necessary (especially

the offer of drugs) to entice the addict to commit a second offense.