# UNITED STATES NAVY–MARINE CORPS COURT OF CRIMINAL APPEALS

———————————————

## No. 201600120

———————————————

## UNITED STATES OF AMERICA
Appellee

v.

## Shaun M. WILEY
Chief Warrant Officer 2 (CWO-2), U.S. Marine Corps
Appellant

———————————————

Appeal from the United States Navy-Marine Corps Trial Judiciary

Military Judge: Lieutenant Colonel Eugene H. Robinson, Jr., USMC.
Convening Authority: Commanding General, III Marine
Expeditionary Force, Camp Foster, Okinawa, Japan.
Staff Judge Advocate's Recommendation: Colonel John M. Hackel,
USMC
For Appellant: James S. Trieschmann, Jr., Esq.; Lieutenant
Jacqueline M. Leonard, JAGC, USN
For Appellee: Lieutenant Commander Jeremy R. Brooks, JAGC,
USN; Captain Sean M. Monks, USMC.

———————————————

Decided 10 August 2017

———————————————

Before CAMPBELL,[1] HUTCHISON, and PETTIT *Appellate Military Judges*

———————————————

**This opinion does not serve as binding precedent, but may be cited as persuasive authority under NMCCA Rule of Practice and Procedure 18.2.**

———————————————

---

[1] Former Senior Judge Campbell took final action in this case prior to detaching from the court.

HUTCHISON, Senior Judge:

At a contested general court-martial, members convicted the appellant of attempted sexual assault of a child, attempted sexual abuse of a child, attempted receipt of child pornography, indecent exposure, communicating indecent language, and solicitation—violations of Articles 80, 120c, and 134, Uniform Code of Military Justice (UCMJ), 10 U.S.C. §§ 880, 920c, and 934 (2012). The convening authority (CA) approved the adjudged sentence of 44 months' confinement and a dismissal.

The appellant originally raised six assignments of error (AOEs). Based upon our initial review, we specified two issues for briefing. The appellant then filed a supplemental AOE. For ease of reading, the AOEs and specified issues are numbered consecutively: (1) the military judge erred in failing to grant the appellant relief under Article 10, UCMJ, or in the alternative, trial defense counsel (TDC) was ineffective; (2) all the Article 80, UCMJ, attempt convictions are factually insufficient because the government failed to prove beyond a reasonable doubt the appellant was not entrapped; (3) the indecent exposure conviction is factually and legally insufficient because the alleged exposure was via electronic media; (4) the solicitation to produce and distribute child pornography conviction—subparagraph (c) of Charge III, Specification 2—is legally and factually insufficient because the solicited undercover agent was not a child; (5) the military judge erred in failing to instruct the members on the affirmative defense of voluntary abandonment; (6) the military judge committed plain error in failing to allow the members to request admissible evidence relevant to the appellant's entrapment defense;[2] (7) subparagraphs (a) and (b) of Charge III, Specification 2— alleging the appellant solicited an undercover agent whom he believed was under the age of 16 to have sexual intercourse with him and receive kisses and oral sex from him—fail to state offenses; (8) the military judge committed plain error in failing to instruct the members on the elements for subparagraphs (a) and (b) of Charge III, Specification 2; and (9) the preemption doctrine requires this court to reverse its holding in *United States v. Robertson*, 17 M.J. 846, 850 (N.M.C.M.R. 1984), and set aside and dismiss the appellant's conviction for Charge III, Specification 2.

Having carefully considered the record of trial and the parties' submissions, we find merit in the third and seventh AOEs. We also note there are several discrepancies in the Court-Martial Order (CMO), including

---

[2] This AOE is raised pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982). We have reviewed and summarily reject it. *United States v. Clifton*, 35 M.J. 79 (C.M.A. 1992).

its failure to set forth the pleas and findings, or other dispositions, for each charge and specification on which the appellant was arraigned, as required by RULE FOR COURTS-MARTIAL (R.C.M.) 1114(c)(1), MANUAL FOR COURTS-MARTIAL, UNITED STATES (2016 ed.).[3] Following the corrective action within our decretal paragraph, we are convinced that the remaining findings and sentence are correct in law and fact and that no error materially prejudicial to the substantial rights of the appellant remains. Arts. 59(a) and 66(c), UCMJ.

## I. BACKGROUND

In March 2015, while stationed in Okinawa, Japan, the appellant responded to a personal advertisement in the "women for men" section of Craigslist, and thereafter, communicated via text message with a person who told him she was 14 years old.[4] In fact, the purported 14-year-old girl was an active duty Sailor, working as an undercover agent (UC) with the Naval Criminal Investigative Service (NCIS). Although the UC's Craigslist advertisement listed her age as "70," it displayed her actual picture as a teenager. During the course of their online conversation over the next two to three days, the appellant engaged in increasingly explicit sexual discussions with the UC, sent her digital pictures of his exposed penis, and asked her to send him illicit photographs of herself. The appellant eventually drove to meet the UC, was apprehended by NCIS, and on 31 March 2015, ordered into pretrial confinement. The government preferred charges, stemming from the appellant's online interactions with the UC, on 24 April 2015.

During a search of the appellant's residence, NCIS and command representatives discovered audio recordings of an argument between the appellant and his wife, PW. NCIS believed the recordings evidenced PW confronting the appellant about raping, forcibly sodomizing, and assaulting her. On 20 May 2015, NCIS agents interviewed PW about the audio recordings. PW explained that the recorded argument occurred in September

---

[3] The appellant was arraigned on 4 charges and 5 additional charges, totaling 29 specifications. Prior to empaneling members, the government withdrew and dismissed some of the charges and specifications, and the military judge dismissed, merged and consolidated other charges and specifications. Thereafter, the military judge, the parties, and the members referred to the charges as reflected on a cleansed charge sheet. *See* Appellate Exhibit (AE) XXXVII. In promulgating his action, the CA refers only to the charges and specifications as reflected in AE XXXVII. Therefore, for the sake of clarity, we will reference the charges and specifications based on AE XXXVII instead of the original charge sheet.

[4] Record at 230. After initially responding to the Craigslist advertisement, further communications were conducted through either iMessage or Kik, a social media "instant text messaging application." *Id.* at 223.

2013 and that the incident giving rise to it did not involve sex. Despite PW's assertions, on 3 June 2015, the government preferred additional charges against the appellant which alleged forcible rape, attempted forcible sodomy, assault consummated by battery, and communicating a threat. NCIS re-interviewed PW on 5 June 2015, and she again denied there was any forcible sex. Both the 20 May and 5 June interviews were recorded.

On 9 June 2015, the government preferred dereliction of duty charges against the appellant for allegedly mishandling classified information. In light of this additional aspect of the investigation, the classified and unclassified evidence within the appellant's NCIS case file became "intermingled."[5] On 11 June 2015, the appellant waived his Article 32, UCMJ, preliminary hearing "for trial strategy purposes."[6]

On 17 July 2015, the appellant was arraigned on all charges, 109 days after being placed into pretrial confinement, and agreed to a trial management order (TMO) scheduling trial for 21 September 2015.[7] The TMO also required that the government complete all pretrial discovery obligations by 27 July 2015.

On 5 August 2015, the government filed a motion to move the trial from 21 September to 6 October 2015 in order to accommodate travel for a government witness.[8] The TDC, in part, responded to the continuance motion:

> Article 10 of the [UCMJ] requires the Government to take immediate steps to try an accused when he is placed in pretrial confinement. The Government's justification in this case—that a witness is going on vacation—is not sufficient to override the Government's responsibilities under Article 10, UCMJ, or [the appellant's] rights under the Sixth Amendment to the United States Constitution.[9]

In a 10 August 2015, Article 39(a), UCMJ, session, the TDC further argued that the appellant was "sitting in pretrial confinement now with his Article 10 rights, with his speedy trial rights. So we certainly don't consent to moving the trial back."[10] However, the Article 10, UCMJ, issue was never

---

[5] Record at 103.

[6] AE XXX at 4.

[7] Record at 6; AE I.

[8] AE III.

[9] AE IV at 1-2.

[10] Record at 16.

litigated, and the military judge did not make any findings of fact or conclusions of law. Rather, the military judge issued a modified TMO that delayed the start of trial for two days, until 23 September 2015.[11]

On 4 September 2015, the government counsel provided the TDC an NCIS interim report of investigation dated 27 August 2015. The interim report stated that after investigators discovered the audio recordings at the appellant's residence, NCIS agents attempted to interview PW, but she declined. The interim report did not mention that NCIS recorded interviews of PW on 20 May and 5 June 2015. The government counsel was also unaware of the 20 May and 5 June 2015 interviews, but he understood that PW would participate at trial.

On 14 September 2015, the government counsel provided the TDC an NCIS report and the summaries of PW's 20 May and 5 June 2015 statements to NCIS. This report was the first indication to the appellant that PW had made any case-related statements. The following day, the government counsel provided the TDC the NCIS video recordings of PW's interviews.

Based on the government's discovery violations, on 17 September 2015, the TDC filed a motion for appropriate relief asking that the charges *related to PW* "be dismissed with prejudice and that [the appellant] be immediately released from pre-trial confinement," or, alternatively, "that the court prevent the [g]overnment from presenting the testimony of [PW] at trial."[12] As a final alternative, the TDC requested a trial continuance for "at least three weeks, to allow the defense additional time to investigate the materials newly provided to the defense."[13] However, the TDC cautioned that the government's "late discovery of exculpatory material" puts the defense in the untenable position of "either (1) agree[ing] to a continuance, thus resulting in [the appellant] spending more time in pretrial confinement and giving the [g]overnment more time to prepare its case; or (2) keep[ing] the currently scheduled trial date without being able to fully investigate the new material provided . . . the week before trial."[14] Although the TDC reminded the military judge that the appellant "has been in pretrial confinement since

---

[11] It is unclear from the record whether the military judge modified the TMO because of the government's continuance request or simply as a matter of docket management. Regardless, nothing in the record suggests the appellant opposed the two day delay ordered by the military judge.

[12] AE XVI at 12.

[13] *Id.*

[14] *Id.* at 11.

March," the motion did not invoke Article 10, UCMJ, and he did not demand speedy trial or request dismissal of the charges.[15]

The military judge found that the government's failure to disclose the interviews of PW constituted discovery and due process violations, but concluded that the "appropriate remedy for this violation is a continuance of the trial."[16] Announcing his ruling during an Article 39(a), UCMJ, session on 23 September 2015, the military judge stated:

> The bottom line is the defense is entitled to a continuance. The question is going to become, really, [h]ow much of a continuance? Right now, the Court is saying that you have the rest of today. But based upon that, you are going also to be allowed the opportunity to review the NCIS case files that list Chief Warrant Officer Wiley as the subject. So, trial counsel, you need to make sure that NCIS is aware that defense is coming over there today. And they need to have those case files ready for inspection by the defense, and they don't need to delay that.[17]

The next day, 24 September 2015, the government counsel informed the court that the NCIS "chain of command" had still not granted approval for the TDC to review the NCIS case files, but expected approval and release of the material later that day.[18] Consequently, *the TDC asked for*, and the military judge granted, a continuance until the following day, 25 September 2015. At 1630 on 24 September 2015, the government produced two of three NCIS investigative files for defense inspection, but redacted several documents from the files. The third file, which contained classified material, was not produced. In response, the TDC filed another motion for appropriate relief based on the government's failure to comply with discovery obligations or the court's orders, this time asking that *all charges* be dismissed or that the proceedings be abated.[19] However, the defense motion—while noting that the appellant remained confined—did not mention Article 10, UCMJ, or demand speedy trial.

At an Article 39(a), UCMJ, session on 25 September 2015, the government provided notice of intent to appeal an earlier decision by the military judge to consolidate and merge several offenses, and requested a

---

[15] *Id.*

[16] AE XXX at 7.

[17] Record at 71.

[18] *Id.* at 74.

[19] AE XLI at 1 (emphasis added).

continuance.[20] The TDC did not oppose the continuance, but expressed concern for the "day-to-day" continuances and the "anxiety" such uncertainty was causing the appellant.[21] As a result, and based on the court docket, the military judge continued the trial until 6 October 2015. The parties did not litigate the defense motion to dismiss or abate the proceedings, but the military judge reiterated to the government counsel the requirement to grant the TDC access to the NCIS case files.

The record is unclear as to what caused the next Article 39(a), UCMJ, session to be delayed until 10 November 2015, but the military judge noted:

> The purpose of this session today is to try and get things back on track in view of the government's Article 62[, UCMJ,] appeal being denied by the appellate government folks. Subsequently, I did order trial to occur the first week of December.[22]

Turning again to the TDC's access to the NCIS case files, the government counsel sought to assert privilege over the remaining case file, pursuant to MILITARY RULE OF EVIDENCE (Mil. R. Evid) 505, MANUAL FOR COURTS-MARTIAL (2012 ed.). The military judge ordered the government to redact classified information from the file and grant the defense access to the unclassified portions by 13 November 2015. The TDC then renewed his request for dismissal of all charges or abatement of the proceedings:

> So we just want to go back to that motion that we filed on [the] 24th of [September], sir. We think that this *month and a half that the government has gotten by filing this Article 62 appeal* does not change the fact of where we were that morning asking this court to either abate or dismiss for noncompliance with this Court's order. So they—it's a month and a half later; they still haven't complied with this Court's order.[23]

---

[20] *See supra*, Note 3.

[21] Record at 101. During the 39(a), UCMJ, session, following the military judge's order continuing the trial until 6 October 2015, the TDC requested that the appellant be released from pretrial confinement. Following a brief recess, the TDC withdrew his request, commenting, "after further consideration we're not going to raise the issue of release from pretrial confinement today. We think that a continuance until 6 October will give the government more time to comply with the Court's order." *Id.* at 106.

[22] *Id.* at 107.

[23] *Id.* at 116 (emphasis added).

The TDC did not demand speedy trial and did not oppose the December trial date. Trial began on 1 December 2015.

## II. DISCUSSION

### A. Article 10, UCMJ

The appellant alleges that the military judge erred in failing to grant relief under Article 10, UCMJ, after his "lengthy pre-trial confinement was prolonged by Government inaction and non-compliance with discovery."[24] We review Article 10, UCMJ, speedy trial claims *de novo. United States v. Cooper*, 58 M.J. 54, 58 (C.A.A.F. 2003).

Article 10, UCMJ, demands that when a service member is placed in pretrial confinement, "immediate steps shall be taken . . . to try him or to dismiss the charges and release him." In reviewing Article 10, UCMJ, claims, courts do not require "constant motion," from the government, but do require "reasonable diligence in bringing the charges to trial." *United States v. Mizgala*, 61 M.J. 122, 127 (C.A.A.F. 2005) (citations and internal quotation marks omitted). This "duty imposed on the [g]overnment immediately to try an accused who is placed in pretrial confinement does not terminate simply because the accused is arraigned." *Cooper*, 58 M.J. at 60. Rather, it extends to "at least the taking of evidence." *Id.* In conducting our review, we give substantial deference to the military judge's findings of fact, reversing only if they are clearly erroneous. *Mizgala,* 61 M.J. at 127. Finally, we look at four factors in examining the circumstances surrounding an alleged Article 10, UCMJ, violation: "(1) the length of the delay; (2) the reasons for the delay; (3) whether the appellant made a demand for a speedy trial; and (4) prejudice to the appellant." *Id.* at 129 (citing *Barker v. Wingo*, 407 U.S. 514, 530 (1972)).

Given this legal framework, and mindful of the appellant's concession that his TDC's "invocation of Article 10, UCMJ, was not a model of clarity,"[25] we now analyze the *Barker* factors. In doing so, we recognize that none of the four factors has any "talismanic power. Rather, we must . . . weigh all the factors collectively before deciding whether a defendant's right to a speedy trial has been violated." *United States v. Wilson*, 72 M.J. 347, 354-55 (C.A.A.F. 2013) (citations and internal quotation marks omitted).

### 1. Length of the delay

The length of delay constitutes a triggering mechanism under Article 10, UCMJ. *See United States v. Thompson*, 68 M.J. 308, 312 (C.A.A.F. 2010) (holding that the 145-day period the appellant spent in pretrial confinement

---

[24] Appellant's Brief of 4 Oct 16 at 12.

[25] *Id.* at 17.

was sufficient to trigger an Article 10, UCMJ, inquiry); *Cossio*, 64 M.J. at 257 (holding that a 117-day period of pretrial confinement triggered the full Article 10, UCMJ, inquiry). The appellant spent 248 days in pretrial confinement. Therefore, we conclude that the delay, from the appellant's placement into pretrial confinement on 31 March 2015 through trial on 1 December 2015, is sufficient to trigger analysis of the remaining *Barker* factors.

*2. Reasons for the delay*

The bulk of the delay now complained of was unrelated to the government's malfeasance in providing discovery. Even assuming 248 days was presumptively prejudicial, the facts of this case demonstrate various legitimate reasons for the delay.

First, we find no unreasonable delay between when the appellant was placed into pretrial confinement, on 31 March 2015, and his 17 July 2015 arraignment. The appellant faced 9 charges and 29 specifications addressing 3 wholly unrelated criminal activities, and involving classified information.[26]

Following arraignment, "a change in the speedy trial landscape [took] place. This is because after arraignment, 'the power of the military judge to process the case increases, and the power of the [g]overnment to affect the case decreases.'" *Cooper*, 58 M.J. at 60 (quoting *United States v. Doty*, 51 M.J. 464, 465-66 (C.A.A.F. 1999). In short, once the appellant was arraigned, the military judge had the "power and responsibility to force the [g]overnment to proceed with its case if justice so require[d]." *Id.*

The military judge, with the concurrence of the TDC, initially issued a TMO setting trial for 21 September 2015. Therefore, any delay between arraignment and 21 September 2015 was presumptively reasonable. *See United States v. King*, 30 M.J. 59, 66 (C.M.A. 1990) (holding that an accused "cannot be responsible for or agreeable to delay and then turn around and demand dismissal for that same delay"); *United States v. Toombs*, 574 F.3d 1262, 1274 (10th Cir. 2009) ("[d]elays attributable to the defendant do not weigh in favor of a Sixth Amendment violation") (citation omitted).

Therefore, in assessing whether the government acted with "reasonable diligence in bringing the charges to trial," we focus on the period between 21 September 2015 and the start of trial on 1 December 2015. *Mizgala*, 61 M.J. at 127. In doing so, we are mindful that "[a] deliberate attempt to delay the trial in order to hamper the defense should be weighted heavily against the

---

[26] While not dispositive for Article 10, UCMJ, purposes, we note that the appellant was arraigned within the timelines prescribed by R.C.M. 707.

government," while "a valid reason . . . should serve to justify appropriate delay." *Barker*, 407 U.S. at 531.

The appellant points to the government's repeated discovery violations as cause for the delay. Specifically, the appellant argues that NCIS caused "unnecessary delay from 27 July until 17 September 2015 by failing to timely disclose recordings of NCIS interviews with [PW]" and again from "27 July 2015 until at least 4 November 2015 . . . by repeatedly failing to comply with the [m]ilitary [j]udge's discovery order directing [d]efense access to the agent's case file."[27] While the government's failure to disclose the interviews with PW amounted to discovery and due process violations, the military judge provided the appropriate remedy by continuing the trial until the TDC had an opportunity to review the material and the NCIS case files. Initially delaying the start of the trial for only a single day, the military judge then granted the *defense request* to further delay the start of trial another day—until 25 September.[28] After the government failed, again, to provide access to the NCIS case file, the defense filed a motion to dismiss the charges, abate the proceedings, or, in the alternative, for a continuance. However, on the same day—25 September 2015—the government filed notice of its intent to appeal the military judge's ruling merging and consolidating several of the charges and specifications.[29] Based on that government notice, the military judge continued the case until 6 October 2015.

While the government did delay in providing the defense access to the NCIS case files, it appears from the scant record before us that the government's delay was not the cause of the continuance between 6 October—the new trial date set by the military judge after the government filed notice of appeal—and the eventual start of trial on 1 December 2015. In opening the 10 November 2015, Article 39(a), UCMJ, session, the military judged noted that after he was informed that the "appellant government folks" had declined to take the government's Article 62, UCMJ, appeal, he then ordered trial to begin the first week of December.[30] Likewise, in that same session, while arguing for the charges to be dismissed based on discovery violations, the TDC pointed out that they were in the same position they were in on 24 September—without access to the NCIS case files—despite the "month and a half that the government has gotten by filing this

---

[27] Appellant's Brief at 16.

[28] Following the military judge's issuance of the revised TMO, trial was set to begin on 23 September 2015. *See supra*, note 10.

[29] AE XLIV.

[30] Record at 107.

Article 62 appeal[.]"[31] The clear import of the these two statements is that the delay from 25 September to 1 December 2015 resulted from the government's decision to pursue an Article 62, UCMJ, appeal, and was independent of the government's discovery violation.

Article 62(c), UCMJ, provides that delays resulting from an appeal under Article 62 "shall be excluded" from speedy trial analysis "unless an appropriate authority determines that the appeal was filed solely for the purpose of delay with the knowledge that it was totally frivolous and without merit." In *United States v. Danylo*, 73 M.J. 183, 187-88 (C.A.A.F. 2014), the Court of Appeals for the Armed Forces (CAAF) found that an unexplained, 170-day delay between the government's notice of appeal and the decision by the Court of Criminal Appeals was not unreasonable. Here, the delay between the government's notice of intent to appeal and the start of the trial was 67 days, and the record is devoid of information from which we could conclude that the 67-day delay was unreasonable, or that the government pursued the appeal for purposes of delay.

We recognize that, normally, the burden is on the prosecution to show that the government proceeded to trial with "reasonable diligence." The appellant points out that "the government must be held responsible" for this 67-day period of delay.[32] The record, however, does not contain any findings of fact or other information, beyond the conclusory statements of the military judge and the TDC indicating the 67-day delay was occasioned by the government's appeal. We can only conclude that the military judge ordered, without objection from the TDC, "trial to occur the first week of December" after the "appellate government folks" denied the appeal.[33] This lack of information in the record is attributable to the failure of the appellant to raise this issue at trial.[34] Consequently, the government had no reason to provide a detailed accounting of their efforts to bring the case to trial in the absence of any motion by the appellant. Under the circumstances, the 67 days between 25 September and 1 December 2015 does not seem unreasonable. Therefore, we conclude, that the reasons for the delay weigh in the government's favor.

---

[31] *Id.* at 116.

[32] Appellant's Brief at 16.

[33] Record at 107.

[34] *Accord United States v. Culpepper*, ACM 34058, 2001 CCA LEXIS 343, at *3 (A.F. Ct. Crim. App. 11 Dec 2001).

This is not to say we condone the government's dilatory discovery practices in this case; rather we simply find that they had little impact on the delays associated with bringing the appellant to trial.

### 3. Demand for speedy trial

As we noted previously, the appellant made no demand for speedy trial. We have long held that "the right to speedy trial is a shield, not a sword," and that "failure to assert the right [] will make it difficult for a defendant to prove that he was denied a speedy trial." *United States v. Miller*, 66 M.J. 571, 575 (N-M. Ct. Crim. App. 2008) (citations and internal quotation marks omitted). Although the appellant moved to dismiss all charges and specifications based on discovery violations, those motions included no demand for a speedy trial.[35] The appellant argues that his multiple requests for dismissal, his invocation of Article 10, UCMJ, in opposition to a government continuance request, and his lengthy pretrial confinement, combined, "were sufficient to invoke Article 10, UCMJ[.]"[36] We disagree and hold that mere references to Article 10, UCMJ—without more—do not constitute a demand for a speedy trial. *See United States v. Foster*, No. 201200235, 2013 CCA LEXIS 92, at *7-8, unpublished op. (N-M. Ct. Crim. App. 7 Feb 2013) (per curiam) (concluding the appellant made no demand for speedy trial where a motion to dismiss did not include a demand for a speedy trial and acknowledged the appellant's agreement to the trial schedule); *United States v. Brooks*, No. 200501266, 2007 CCA LEXIS 166, at *12-14, unpublished op. (N-M. Ct. Crim. App. 16 May 2007) (holding there was no demand for a speedy trial, despite the appellant filing a motion to dismiss based on denial of speedy trial rights), *aff'd on other grounds*, 66 M.J. 221 (C.A.A.F. 2008). Indeed, following the government's failure to provide access to the NCIS case file on 23 September 2015, as ordered by the military judge, the TDC asked for a continuance; and following the government's aborted appeal, the TDC raised no objections to the new trial date of 1 December 2015. Therefore, this factor weighs in favor of the government.

### 4. Prejudice to the appellant

"'Prejudice . . . should be assessed in the light of the interests of defendants which the speedy trial right was designed to protect.'" *Mizgala*, 61 M.J. at 129 (quoting *Barker*, 407 U.S. at 532). We, therefore, examine the question of prejudice in light of three important interests the Supreme Court identified in *Barker*: (1) to prevent oppressive pretrial incarceration; (2) to minimize anxiety and concern; and (3) to limit the possibility that the defense

---

[35] *See* AE XLI; Record at 116.

[36] Appellant's Brief at 17-18.

will be impaired. *Barker*, 407 U.S. at 532. "'Of these, the most serious is the last, because the inability of a defendant adequately to prepare his case skews the fairness of the entire system.'" *Mizgala*, 61 M.J. at 129 (quoting *Barker*, 407 U.S. at 532).

The appellant contends that the delay in his court-martial precluded his father from testifying live, in-court, as a sentencing witness. His father flew to Okinawa to testify in September 2015, but was unable to return in December 2015 because of poor health. The appellant argues these circumstances are similar to *United States v. Stellato*, 74 M.J. 473, 489 (C.A.A.F. 2015), where our superior court affirmed a military judge's decision to dismiss charges after repeated government discovery violations. In *Stellato,* the CAAF found prejudice when the government's continuing discovery violations not only resulted in the defense's inability to call a key witness who died before trial, but also because the violations "resulted in lost evidence, unaccounted for evidence, and evidence left in the hands of an interested party." *Id.* at 490. Here, the appellant has not alleged any lost or unaccounted for evidence—only that his father had to testify telephonically during sentencing.

The appellant also argues that the constant changes to the trial schedule caused anxiety and that he suffered oppressive conditions of confinement, because he was unable to access his prescribed medications. However, he has provided no evidence that his anxiety was any greater than normal,[37] and nothing in the record indicates that the appellant filed an Article 13, UCMJ, motion concerning oppressive treatment in pretrial confinement.[38] In fact, the TDC informed the military judge that he had already "remedie[d] the issue" of medication for the appellant before trial started.[39] Consequently, the appellant's failure to demonstrate prejudice in terms of oppressive confinement, heightened anxiety, or his ability to prepare for trial and present evidence weighs in favor of the government.

---

[37] *See Wilson*, 72 M.J. at 354 (expressing the CAAF's concern "not with the normal anxiety and concern experienced by an individual in pretrial confinement, but rather with some degree of particularized anxiety and concern greater than the normal anxiety and concern associated with pretrial confinement") (citations omitted).

[38] *See Thompson*, 68 M.J. at 313 (concluding that failure to raise an Article 13, UCMJ, motion, though not dispositive of an Article 10, UCMJ, claim, may be considered as a relevant factor bearing upon the question of prejudice for oppressive confinement).

[39] AE XXXVI at 2.

In balancing the *Barker* factors, we conclude the appellant was not denied his right to a speedy trial under Article 10, UCMJ, and consequently, the military judge did not err in failing to grant relief. Even though the appellant spent 248 days in pretrial confinement and the government's discovery practice was fraught with error, the appellant never demanded speedy trial. From the record before us, it appears much of the delay was attributed to either an agreed upon, distant, trial date or a valid pursuit of an Article 62, UCMJ, appeal. In reality, the government's discovery violation had very little impact on the trial dates. As a result, despite the discovery violation, we conclude that the government proceeded to trial with reasonable diligence under the circumstances of this case.

*5. Ineffective assistance of counsel*

Finally, as an alternative to his Article 10, UCMJ, complaint, and recognizing that the TDC's "invocation of Article 10, UCMJ, was not a model of clarity,"[40] the appellant argues that TDC was ineffective for "failing to forcefully seek Article 10, UCMJ, relief[.]"[41] In reviewing claims of ineffective assistance of counsel, we "look at the questions of deficient performance and prejudice *de novo.*" *United States v. Datavs*, 71 M.J. 420, 424 (C.A.A.F. 2012) (citation and internal quotation marks omitted). However, we "'must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.'" *United States v. Tippit*, 65 M.J. 69, 76 (C.A.A.F. 2007) (quoting *Strickland v. Washington*, 466 U.S. 668, 689 (1984)). Thus, the appellant bears the burden of demonstrating (1) that his counsel's performance was deficient to the point that he "was not functioning as the 'counsel' guaranteed by the Sixth Amendment" and (2) that the deficient performance prejudiced the defense. *Id.* (Citations and internal quotation marks omitted).

In order to satisfy the second prong of *Strickland*, and demonstrate prejudice when a claim of ineffective assistance of counsel is premised on the TDC's failure to seek Article 10, UCMJ, relief at trial, an appellant must demonstrate that he would prevail on appeal. *Tippit*, 65 M.J. at 81; *see also United States v. Purdin*, No. 20120277, 2014 CCA LEXIS 683, at *11, unpublished op. (A. Ct. Crim. App. 12 Sep 2014) (holding there was no ineffective assistance of counsel since the appellant would not have prevailed on an Article 10, UCMJ, motion if raised at trial).

For all the reasons set forth above, we conclude that there is no likelihood the appellant would have prevailed if the TDC had made a demand for

---

[40] Appellant's Brief at 17.

[41] *Id.* at 21.

speedy trial and litigated a motion under Article 10, UCMJ. The remaining *Barker* factors—the reasons for the delay and lack of any prejudice to the appellant—would still favor the government. As a result, the appellant's claim that his TDC was ineffective is without merit.

**B. Entrapment**

The appellant next avers that the government failed to prove beyond a reasonable doubt that he had the requisite *mens rea* to commit the Charge I attempt crimes for which he was convicted. Alternatively, he claims to have been entrapped, and that, therefore, factually insufficient evidence supports those convictions.[42]

We review questions of factual sufficiency *de novo.* Art. 66(c), UCMJ; *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002). The test for factual sufficiency is whether "after weighing all the evidence in the record of trial and recognizing that we did not see or hear the witnesses as did the trial court, this court is convinced of the appellant's guilt beyond a reasonable doubt." *United States v. Rankin*, 63 M.J. 552, 557 (N-M. Ct. Crim. App. 2006) (citing *United States v. Turner*, 25 M.J. 324, 325 (C.M.A. 1987) and Art. 66(c), UCMJ), *aff'd on other grounds*, 64 M.J. 348 (C.A.A.F. 2007). In conducting this unique appellate role, we take "a fresh, impartial look at the evidence," applying "neither a presumption of innocence nor a presumption of guilt" to "make [our] own independent determination as to whether the evidence constitutes proof of each required element beyond a reasonable doubt." *Washington*, 57 M.J. at 399.

The appellant argues that we "cannot be convinced beyond a reasonable doubt that [he] intended to have sexual relations with a minor because [we] cannot be convinced beyond a reasonable doubt that [he] was anything other than confused about the age of the person with whom he was dealing."[43] The appellant notes the UC sent him current photographs of herself as an adult and argues his online conversations with the UC evidence an ambivalence towards their relationship based on concerns about the UC's real age. These concerns, according to the appellant, were caused by the use of "different ages in her social media persona, none of which was under the age of consent."[44]

---

[42] Although the military judge instructed the members that the "evidence has raised the issue of entrapment in relation to the offenses of attempted sexual assault of a child, attempted sexual abuse of a child, attempted receipt of child pornography, indecent exposure, indecent language, and soliciting another to commit an offense[,]" Record at 315, the appellant does not contend on appeal that his Charge II and III convictions are factually insufficient due to entrapment. *See* Appellant's Brief at 29.

[43] Appellant's Brief at 25.

[44] *Id.* (citation omitted)

We disagree. The government offered 241 pages of text messages between the appellant and the UC.[45] Throughout those text messages, the UC tells the appellant, numerous times, and the appellant acknowledges, that she is a minor:

> Appellant: So tell me the secret of your beauty and youthful glow
>
> . . .
>
> UC: I'm 14[46]
>
> . . . .
>
> Appellant: I'm old enough to be your daddy[47]
>
> . . . .
>
> Appellant: You seem like a pretty cool chic, but the law cares sweetheart!![48]
>
> . . . .
>
> Appellant: I'm going to jail...
>
> UC: Omg why
>
> Appellant: I'm flirting with a little girl[49]
>
> . . . .
>
> Appellant: I'm always going to want to see your body... You are forbidden fruit.[50]
>
> . . . .
>
> Appellant: I forget you are so young.
>
> UC: Practically 15. I'm not young
>
> Appellant: Yes. That's young.
>
> UC: Ohkay (sic).
>
> Appellant: too young to be talking to an old man about sex[51]

---

[45] Prosecution Exhibit 2.

[46] *Id.* at 18.

[47] *Id.* at 22.

[48] *Id.* at 24.

[49] *Id.* at 71.

[50] *Id.* at 171.

. . . .

Appellant: I cannot pretend you aren't a child.[52]

. . . .

Appellant: You are beautiful. That's why it's hard for me because you're practically 15[53]

The appellant's text messages and subsequent actions further indicated his specific intent to commit the crimes alleged under Charge I. He told the UC he would kiss her thighs and, "ass cheeks," and "lick every square" of her vagina;[54] he requested, encouraged, and directed the UC to digitally penetrate herself; he sent the UC digital images of his exposed penis; he repeatedly requested pictures of the UC's exposed genitalia; and he eventually drove to the UC's house to meet her. These facts leave us convinced beyond a reasonable doubt that the appellant actually believed the UC was a minor and, therefore, had the requisite *mens rea* to commit the attempt crimes under Charge I, for which he was convicted.

Regarding the appellant's contention that he was entrapped, when "the trier of fact f[inds] against him on the entrapment issue, [an] appellant can only prevail by showing that these findings are incorrect as a matter of law." *United States v. Vanzandt*, 14 M.J. 332, 345 (C.M.A. 1982). Entrapment is an affirmative defense in which "the criminal design or suggestion to commit the offense originated in the [g]overnment and the accused had no predisposition to commit the offense."[55] In order for an entrapment defense to prevail, "the defense has the initial burden of . . . show[ing] that a government agent originated the suggestion to commit the crime." *United States v. Whittle*, 34 M.J 206, 208 (C.M.A. 1992). Once the defense has met that initial burden, the burden shifts to the government to prove beyond a reasonable doubt either, (1) that the "criminal design did not originate with the [g]overnment;" or (2) "that the accused had a predisposition to commit the offense, prior to first being approached by [g]overnment agents." *Id.* (citations and internal quotation marks omitted).

In effect, the first element of entrapment is an inducement by the government to commit the crime. *United States v. Howell*, 36 M.J. 354, 359-60 (C.M.A. 1993). "Inducement is government conduct that creates a

---

[51] *Id.* at 192.

[52] *Id.* at 193.

[53] *Id.* at 205.

[54] *Id.* at 90-96.

[55] R.C.M. 916(g).

substantial risk that an undisposed person or otherwise law-abiding citizen would commit the offense" and can take many forms, including fraudulent representations, threats, persuasion, coercive tactics, or even pleas "based on need, sympathy, or friendship." *United States v. Hall*, 56 M.J. 432, 436 (C.A.A.F. 2002) (citations and internal quotation marks omitted). However, there is no inducement where government agents simply "provide the opportunity or facilities to commit the crime[.]" *Id.* at 437 (citations and internal quotation marks omitted).

The appellant argues that the UC induced him to engage in the offenses under Charge I by initially representing herself as an adult in her online profile and steering their conversation towards sexual matters. Additionally, the appellant argues that his lack of child pornography in his possession indicates that he was not predisposed to commit the crimes. Again, we disagree. The UC repeatedly told the appellant that she was 14, and he still continued to send her sexually explicit images and messages. Ironically, at one point, the appellant thought the UC might be involved in a sting operation. But when she proved she was a real person—by sending him a picture—he redoubled his efforts to get her to send him child pornography and to meet her.

Likewise, we are convinced the appellant was predisposed to commit these offenses. Within hours of first contacting the UC, the appellant sent a picture of himself without a shirt on and commented on the fact that she was so young. Without prompting, the appellant asked the UC, who he believed to be a 14-year-old girl, to "[t]ell [him] a naughty secret no one else knows."[56] The fact that the government merely provided the appellant the "opportunit[y] . . . for the commission of the offense does not constitute entrapment." R.C.M. 916(g), Discussion.[57]

## C. Indecent exposure

In *United States v. Uriostegui*, 75 M.J. 857 (N-M. Ct. Crim. App. 2016), we held that it was an abuse of discretion for a military judge to accept a guilty plea to indecent exposure based on the same factual scenario for which this appellant was convicted—sending a digital image of his exposed penis via electronic media. Although *Uriostegui* involved a guilty plea, we see no reason to distinguish its application from the nearly identical facts here.

---

[56] PE 2 at 6.

[57] *See also United States v. Bell*, 38 M.J. 358, 360 (C.M.A. 1993) (finding that entrapment "only comes into play" when "the [g]overnment's deception actually implants the criminal design in the mind of the defendant").

Indeed, we found that Uriostegui's "actions would be legally insufficient to support an indecent exposure conviction if a rehearing was authorized." *Id.* at 865-66. Therefore, in accordance with that holding, we find the appellant's conviction of indecent exposure was based upon factually and legally insufficient evidence, and we set it aside.

**D. Solicitation offenses**

The crimes alleged in Charge III, Specification 2 were originally charged as six separate specifications of solicitation. The military judge consolidated them into a single specification alleging three solicitations:

> In that [the appellant], while on active duty, did, on or near Okinawa, Japan, between on or about 24 March 2015 and on or about 31 March 2015, wrongfully solicit [the UC], when he believed she had not attained the age of sixteen years:
>
> a) to have sexual intercourse with him, by planning, requesting, and encouraging her to meet him in person;
>
> b) to kiss her and to penetrate her vagina and anus with his tongue, by planning, requesting, and encouraging her to meet him in person;
>
> c) to produce and distribute child pornography, by planning, requesting, and encouraging her to create and send to him digital images of her exposed genitalia; and that said conduct was to the prejudice of good order and discipline in the armed forces and was of a nature to bring discredit upon the armed forces.[58]

We specified for briefing whether subparagraphs (a) and (b) stated offenses, or alternatively, whether the military judge committed prejudicial error in failing to instruct the members regarding the elements of subparagraphs (a) and (b). The appellant, separately, challenged the legal and factual sufficiency of his conviction under subparagraph (c).

*1. Solicitation to produce and distribute child pornography*

The appellant argues "the images which he requested were not child pornography" and, therefore, his conviction for soliciting the UC to produce and distribute child pornography is legally and factually insufficient.[59] He contends that, because the UC was not actually a minor, his request for her to take and send him photos of her exposed genitalia was not a criminal act.

---

[58] AE XXXVII at 3-4; Record at 90.

[59] Appellant's Brief at 32.

In order to solicit another to commit an offense, the appellant must have "solicited or advised a certain person . . . to commit a certain offense under the code" with "the intent that the offense actually be committed[.]" MANUAL FOR COURTS-MARTIAL (MCM), UNITED STATES (2012 ed.), Part IV, ¶ 105b. The person solicited "must be capable of committing a separate criminal offense prohibited by the UCMJ." *United States v. Ashworth*, No. 201500028, 2015 CCA LEXIS 373, at *4, unpublished op. (N-M. Ct. Crim. App. 3 Sep 2015) (per curiam). However, the criminal act of "solicitation appears to involve nothing more than making a nefarious request or suggestion[.]" *Id.*

The appellant argues that the facts underlying his solicitation offense are similar to those in *United States v. Sutton*, 68 M.J. 455 (C.A.A.F. 2010), where the CAAF set aside Sutton's conviction for soliciting his stepdaughter to commit indecent liberties when he asked her to lift up her shirt and show him her breasts. The CAAF held that the stepdaughter's actions in lifting up her shirt "could not constitute the criminal offense of indecent liberties with a child by [the stepdaughter]" because she could not "commit the offense of indecent liberties with a child on herself." *Id.* at 459.

The appellant's reliance on *Sutton*, however, is misplaced. In *Ashworth*, we affirmed a conviction for soliciting distribution of child pornography after Ashworth pleaded guilty and admitted to asking actual minors, with whom he conversed online, to take and share "sexually explicit photos of themselves" with him. *Ashworth*, 2015 CCA LEXIS 373, at *9. Citing *Ashworth*, our sister court recently concluded that "a child can commit the offense of producing child pornography[,]" noting that child pornography is contraband, and finding "[t]he plain language of the offense has no exception that would allow children to produce and distribute child pornography, even when the images are of themselves." *United States v. Thomas*, No. 20150205, 2016 CCA LEXIS 551, at *10, unpublished op. (A. Ct. Crim. App. 9 Sep 2016). We agree. Thus, unlike *Sutton*, where the acts solicited would not constitute a crime on the part of the solicited minor, had the UC here been an actual minor, she would have committed "a separate criminal offense" by taking pictures of her exposed genitalia and sending them to the appellant." *Ashworth*, 2015 CCA LEXIS 373, at *4.

Additionally, as we recently held in *United States v. Dellacamera*, No. 201600230, 2017 CCA LEXIS 209, unpublished op. (N-M. Ct. Crim. App. 30 Mar 2017), even though the photos would not have involved a minor had the UC actually complied with the appellant's request, the appellant nonetheless engaged in an *act of seriously requesting* production and distribution of child pornography," *Id.* at *9 (emphasis in original). Since we treat the appellant in accordance with the facts as he believed them to be at the time, his "mistaken notion regarding the identity of the party he solicited affords him no defense[.]" *Id.* Therefore, after considering all of the evidence in a light most

favorable to the prosecution, we are convinced that a rational factfinder could have found the appellant guilty of soliciting the production and distribution of child pornography. Likewise, after making allowances for not having personally observed the witnesses, we are convinced beyond a reasonable doubt of the appellant's guilt.

*2. Solicitation of the UC to sexually assault and sexually abuse herself*

"'A specification states an offense if it alleges, either expressly or by implication, every element of the offense, so as to give the accused notice and protection against double jeopardy.'" *United States v. Sutton,* 68 M.J. 455, 455 (C.A.A.F. 2010) (quoting *United States v. Crafter,* 64 M.J. 209, 211 (C.A.A.F. 2006)).

The elements of "soliciting another to commit an offense" under Article 134, UCMJ, are:

> (1) That the accused solicited or advised a certain person or persons to commit a certain offense under the code other than one of the four offenses named in Article 82[, UCMJ];
>
> (2) That the accused did so with the intent that the offense actually be committed; and
>
> (3) That under the circumstances, the conduct of the accused was to the prejudice of good order and discipline in the armed forces or was of a nature to bring discredit upon the armed forces.[60]

Charge III, Specification 2, subparagraphs (a) and (b), alleged the appellant solicited the sexual assault of a child and sexual abuse of a child, respectively. The elements of that solicited sexual assault of a child are:

> (1) That the accused committed a sexual act upon a child causing contact between the penis and vulva or anus or mouth; and
>
> (2) That at the time of the sexual act the child had attained the age of 12 years but had not attained the age of 16 years.[61]

The elements of that solicited sexual abuse of a child are:

> (1) That the accused committed sexual contact upon a child by touching, or causing another person to touch, either directly or through the clothing, the genitalia, anus, groin, breast, inner thigh, or buttocks of any person; and

---

[60] MCM, Part IV, ¶ 105b.

[61] *Id.* at Part IV, ¶ 45b.b(3)a.

(2) That the accused did so with intent to abuse, humiliate, harass, or degrade any person or to arouse or gratify the sexual desire of any person.[62]

As noted previously, the recipient of a solicitation "*must be capable of committing a separate criminal offense prohibited by the UCMJ.*" *Ashworth*, 2015 CCA LEXIS 373, at *4 (emphasis added). Applying that principle—and treating the appellant in accordance with the facts as he believed them—the appellant's text messages could not constitute solicitation under subparagraphs (a) and (b) because, like the solicited party in *Sutton* that could not commit indecent liberties with a child on herself, an actual 14-year-old, in the UC's position, would commit no crime by having sexual intercourse with the appellant or permitting him to kiss her and penetrate her vagina and anus with his tongue. Therefore, subparagraphs (a) and (b) fail to state offenses, and we dismiss the language under those subparagraphs.[63]

### E. Voluntary abandonment

The appellant next contends, for the first time on appeal, that the military judge erred in failing to instruct the members on the doctrine of voluntary abandonment regarding Charge I, Specification 3—alleging the appellant attempted to receive child pornography—since the appellant's "statements concerning his regret and disgust prior to actually receiving any child pornography necessitated such an instruction."[64] Voluntary abandonment is:

> a defense to an attempt offense that the person voluntarily and completely abandoned the intended crime, solely because of the person's own sense that it was wrong, prior to the completion of the crime. The voluntary abandonment defense is not allowed if abandonment results, in whole or in part, from other reasons, for example, the person feared detection or apprehension, decided to await a better opportunity for success, was unable to

---

[62] *Id.* at Part IV, ¶ 45b.b(4)a. To the extent the sexual abuse includes kissing the UC, as opposed to "penetrating her vagina and anus with his tongue," the elements are (1) "That the accused committed sexual contact upon a child by touching, or causing another person to touch, either directly or through the clothing, any body part of any person; and ([2]) That the accused did so with intent to arouse or gratify the sexual desire of any person." *Id.* at Part IV, ¶ 45b.b(4)b.

[63] This conclusion renders moot the other specified issue—whether the military judge committed plain error in failing to instruct the members on the elements for subparagraphs (a) and (b) of Charge III, Specification 2.

[64] Appellant's Brief at 34.

complete the crime, or encountered unanticipated difficulties or unexpected resistance.[65]

Before instructing the members on findings, the military judge asked if there were "any other instructions coming to mind based upon the evidence as it has been presented at this point?"[66] The TDC replied in the negative and did not mention or raise voluntary abandonment as a defense. Because the appellant did not request a voluntary abandonment instruction, or otherwise object to the instructions the military judge ultimately gave the members, this issue was forfeited, and we review for plain error. *United States v. Feliciano*, 76 M.J. 237, 239-40 (C.A.A.F. 2017); *see also United States v. Davis*, 76 M.J. 224, 229 (C.A.A.F. 2017) (holding that failure to request a required instruction or otherwise object to the final form of instructions constitutes forfeiture and reviewing courts will test for plain error).

"'Under a plain error analysis, the accused has the burden of demonstrating that: (1) there was error; (2) the error was plain or obvious; and (3) the error materially prejudiced a substantial right of the accused.'" *Davis*, 76 M.J. at 230 (quoting *United States v. Payne*, 73 M.J. 19, 23 (C.A.A.F. 2014)). "[T]he failure to establish any one of the prongs is fatal to a plain error claim." *United States v. Bungert*, 62 M.J. 346, 348 (C.A.A.F. 2006).

In conducting our plain error analysis, we must first determine whether the military judge erred. For an affirmative defense, "[a] military judge must give such an instruction if . . . 'there is some evidence in the record, without regard to credibility, that the members could rely upon if they choose.'" *Feliciano*, 76 M.J. at 240 (quoting *United States v. Behenna*, 71 M.J. 228, 234 (C.A.A.F. 2012)). "In other words, a military judge must instruct on [the] defense when, viewing the evidence in the light most favorable to the defense, a rational member could have found in the favor of the accused in regard to that defense." *Id.* (citation and internal quotation marks omitted). Consequently, if the record lacks any evidence that would trigger a military judge's duty to provide an instruction on an affirmative defense, it is not error to avoid giving that instruction. *United States v. Stanley*, 71 M.J. 60, 64 (C.A.A.F. 2012).

The appellant argues that after requesting explicit pictures of the UC, his subsequent regret and disgust—as evidenced from his text message that he

---

[65] MANUAL FOR COURTS-MARTIAL, Part IV, ¶ 4.c.(4) (2012 ed.).

[66] Record at 287.

was "sick to his stomach" about talking with the UC about sex[67]— "demonstrate[s] a withdrawal from the attempt to obtain intimate photos[.]"[68] However, the appellant continued to seek explicit images of the UC *after* his expressions of regret, texting "[w]hen you send me pics/videos like I sent you, then it will be fair. You shouldn't be mad at me[.] I've done everything you've asked"[69] and "you refuse to send me my video(s) that you PROMISED…I'll think about forgiving you."[70] When the UC subsequently sent a picture of herself clothed, the appellant said she was only partially forgiven but was "getting closer."[71] In short, the appellant's continued conduct belies the notion that he voluntarily and completely abandoned his attempt to receive child pornography.

Even without the appellant's subsequent conduct, we are not persuaded that the appellant's expression of disgust amounts to evidence of abandonment. Indeed, after numerous requests for explicit images of the UC, the appellant never told the UC not to send him those pictures or took any affirmative steps to ensure he would not receive any such images. Having found no evidence of voluntary abandonment, we conclude the military judge did not commit plain error when he did not instruct members on the voluntary abandonment defense.

**F. Preemption**

Finally, the appellant urges this court to dismiss Charge III, Specification 2,[72] because he believed he was soliciting a civilian, not subject to UCMJ jurisdiction, who could not commit "a separate criminal offense *prohibited by the UCMJ.*" *Ashworth*, 2015 CCA LEXIS 373, at *4 (emphasis added). The appellant contends that because the President established as an element of solicitation, "that the accused solicited . . . a person or persons to commit a certain offense *under the code,*" this necessarily implies that the person solicited must be subject to the code and, therefore, the government is

---

[67] PE 2 at 194. *See also Id.* at 185 ("I must be losing my mind. I'm so sorry for sending you those pictures. OMG. Please if this is all for real we need to talk. You are a sweetheart and I would hate to see you hurt.").

[68] Appellant's Brief at 37.

[69] PE 2 at 205.

[70] *Id.* at 215.

[71] *Id.* at 218.

[72] Having already set aside subparagraphs (a) and (b) of the specification *supra*, we consider this AOE only as it relates to the remainder of the specification.

preempted from substituting a less burdensome requirement, that the offense would be under the code if committed by someone subject to the code.[73]

Service courts have routinely rejected such arguments. In *Robertson*, we held that "[t]he solicitation of another person to commit an offense which, if committed by one subject to the UCMJ, would be punishable under the UCMJ, is an offense cognizable under Article 134." 17 M.J. at 851 (citation omitted). Relying on *Robertson*, we more recently opined that "[t]he solicited person's status as someone not subject to the UCMJ is irrelevant." *United States v. Brondeau* No. 201400140, 2014 CCA LEXIS 702, at \*7, unpublished op. (N-M. Ct. Crim. App. 23 Sep 2014) (per curiam); *see also United States v. Greene*, No. 20130401, 2015 CCA LEXIS 274, at \*4, unpublished op. (A. Ct. Crim. App. 29 June 2015) ("the question in determining whether an Article 134 violation has occurred is not whether the person solicited could have violated the UCMJ but instead whether the offense, 'if committed by one subject to the code, would be punishable under the code.'" (quoting MCM, Part IV, ¶ 105.e.)); *United States v. Hanner*, No. 28497, 1993 CMR LEXIS 61, at \*6, unpublished op. (A.F.C.M.R. 28 Jan 1993) ("The person solicited can be a civilian.") (citations omitted).

The appellant argues that we should overturn *Robertson*, because we did not consider the preemption doctrine—that "Congress has preempted the field of a given type of misconduct by addressing it in one of the specific punitive articles of the Code and that another offense cannot be created and punished under the general article simply by deleting a vital element." *United States v. Kick*, 7 M.J. 82, 88 (C.M.A. 1979) (Perry, J., dissenting). Courts have typically applied the preemption doctrine in two factual scenarios: (1) in preventing the government from charging misconduct under Article 134, UCMJ, that is already covered by Articles 80 through 132, UCMJ;[74] and (2) in preventing "the government from using a novel specification to allege an Article 134 offense that is already listed *inside* the article's framework." *United States v. Reese*, 76 M.J. 297 (C.A.A.F. 2017) (emphasis in original); *see also* MCM, Part IV, ¶ 60.c.(6)(c) (2012 ed.). The appellant's conviction under Charge III, Specification 2 falls under neither scenario. Simply put, the solicitation specification contains distinct elements not included by a different UCMJ punitive article. Therefore, we see no reason to deviate from holdings in *Robertson* and *Brondeau* that soliciting or advising anyone to commit an offense which, if committed by someone subject

---

[73] MCM, Part. IV, ¶ 105.b.(1).

[74] *See Id.* at Part IV, ¶ 60.c.(5)(a).

to the UCMJ, would be punishable under the UCMJ, is an offense cognizable under Article 134.[75]

## G. Sentence reassessment

Although we have set aside the indecent exposure conviction and the sexual assault and sexual abuse language from the solicitation offense, we are convinced that the set aside specification and language did not affect the sentencing decision, and we, therefore, see no need to reassess the sentence.

First, the military judge merged, for sentencing, the indecent exposure with Charge I, Specification 2, which, in part, included the appellant's lewd act by intentionally exposing his genitalia. Second, although we set aside the Charge III, Specification 2, subparagraph (a) and (b) language, the appellant remains convicted of that specification's remaining language. Moreover, as we noted *supra*, the military judge seemingly disregarded those now set aside subparagraphs and, instead, treated the specification as if it only alleged soliciting the production and distribution of child pornography. As a result, the military judge further merged that specification with Charge I, Specification 3—attempted receipt of child pornography—for sentencing. Therefore, the appellant was not prejudiced, as the members considered only crimes for which he remains convicted in reaching the adjudged sentence. *See United States v. Elespuru*, 73 M.J. 326, 330 (C.A.A.F. 2014).

### III. CONCLUSION

The findings of guilty to Charge II and its sole specification, as well as the language in subparagraphs (a) and (b) of Charge III, Specification 2, are set aside and dismissed with prejudice. The remaining findings and the sentence are affirmed.

The supplemental promulgating order will reflect the pleas and findings for each of the charges and specifications upon which the appellant was arraigned. It will properly note that the military judge:

 (1) dismissed Charge I, Specification 2 and consolidated it with Charge I, Specification 1;

(2) dismissed Charge I, Specifications 4 through 7, consolidated them with Charge I, Specification 3, and then renumbered the resulting consolidated specification as Charge I, Specification 2;

(3) dismissed Charge I, Specification 8;

---

[75] As we note, *infra*, the military judge merged Charge III, Specification 2 with Charge I, Specification 3 (attempted receipt of child pornography) for sentencing. Therefore, even if we dismissed Charge III, Specification 2, it would not affect the appellant's sentence.

(4) renumbered Charge I, Specification 9 as Charge I, Specification 3;

(5) renumbered the sole specification of Charge III as Charge III, Specification 1;

(6) dismissed Charge IV, Specifications 2 through 6, consolidated them with Charge IV, Specification 1, and then renumbered the resulting consolidated specification as Charge III, Specification 2; and

(7) entered a Not Guilty finding to Additional Charge IV[76] and its sole specification, following an R.C.M. 917 defense motion.

The supplemental promulgating order will also reflect that: (1) Additional Charge I and the two specifications thereunder, Additional Charge II and the two specifications thereunder, and Additional Charge III, Specification 4, were withdrawn and dismissed following the entry of pleas; and (2) Additional Charge V and the three specifications thereunder were withdrawn and dismissed after arraignment but before the entry of pleas. Finally, the supplemental promulgating order will reflect that the appellant is entitled to 248 days of confinement credit. *United States v. Crumpley*, 49 M.J. 538, 539 (N-M. Ct. Crim. App. 1998).

Senior Judge CAMPBELL and Judge PETTIT concur.

For the Court



R.H. TROIDL
Clerk of Court

---

[76] Following the government's withdrawal of Additional Charges I and II, Additional Charge IV is reflected as Additional Charge II on the cleansed Charge Sheet, AE XXXVII, and on the CMO.