# United States Navy–Marine Corps Court of Criminal Appeals

Before
TANG, LAWRENCE, and J. STEPHENS,
Appellate Military Judges

_____

**UNITED STATES**
Appellee

**v.**

**Winfred L. GRUBBS**
Sergeant (E-5), U.S. Marine Corps
Appellant

**No. 201800300**

Decided: 4 October 2019

Appeal from the United States Navy-Marine Corps Trial Judiciary. Military Judges: Commander Stephen C. Reyes, JAGC, USN (arraignment); Lieutenant Colonel Eugene H. Robinson, USMC (motions); Lieutenant Colonel Brian E. Kasprzyk, USMC (trial). Sentence Adjudged: 21 June 2018 by a general court-martial convened at Marine Corps Base Camp Foster, Okinawa, Japan, consisting of officer and enlisted members. Sentence approved by convening authority: reduction to E-1, total forfeiture of pay and allowances, confinement for eight months, and a dishonorable discharge.

For Appellant: Lieutenant Commander Jeremy J. Wall, JAGC, USN.

For Appellee: Lieutenant Timothy C. Ceder, JAGC, USN.

Judge J. STEPHENS delivered the opinion of the Court, in which Senior Judge TANG and Judge LAWRENCE joined.

_____

**This opinion does not serve as binding precedent, but
may be cited as persuasive authority under NMCCA
Rule of Practice and Procedure 30.2**

_____

J. STEPHENS, Judge:

A panel convicted Appellant, contrary to his pleas, of attempted sexual assault of a child, attempted sexual abuse of a child, and solicitation of child pornography in violation of Articles 80 and 134, Uniform Code of Military Justice (UCMJ).[1]

Appellant raises a single assignment of error: that the findings are legally and factually insufficient because the Government failed to prove, beyond a reasonable doubt, Appellant was not entrapped. We affirm the findings and sentence. However, we find insufficient evidence of one of the terminal elements of the sole specification of Charge II, except out the language, conduct a sentence reassessment, and take action in our decretal paragraph.

## I. BACKGROUND

On 1 February 2018, Appellant, a 25-year-old sergeant, entered an apartment building aboard Marine Corps Base Camp Foster in Okinawa, Japan. He believed he was to rendezvous with "Monroe," a 14-year-old female dependent who lived in the apartment building, while her single mother was staying overnight elsewhere. The rendezvous was a chance to have sexual intercourse and oral sex with Monroe, with whom he had carried on a days-long conversation via electronic messaging. In addition to his American and Japanese cell phones, Appellant carried with him two condoms and a package of gummy bears, the latter having been specially requested by the girl. Instead of meeting Monroe, Appellant met Naval Criminal Investigative Service (NCIS) special agents as he stepped off the elevator to Monroe's floor. Unknown to Appellant, he had not been conversing with Monroe, but rather an NCIS special agent posing as a child. This was part of an undercover operation to catch service members attempting to engage in sexual conduct with minors and to solicit child pornography.

Appellant began chatting online with Monroe a few days before NCIS apprehended him. NCIS Special Agent MK, posing as Monroe, posted a single

---

[1] 10 U.S.C. §§ 880, 934 (2012).

message on "Whisper"—an online application that facilitates anonymous conversations between users. Monroe's posting read, "I want a BF [boyfriend] who is mature and doesn't fart on me and laugh."[2] Appellant replied, "You have a preference?"[3] This started the initial conversation:

[Monroe]: Preference?

[Appellant]: Age race size

[Monroe]: Oh haha im 14 so I don't have much experience

[Monroe]: I just like nice

[Appellant]: Oh

[Monroe]: You in Okinawa?[4]

In their initial conversation, Appellant identified himself by his nickname "Pooh," and he traded photographs with Monroe.[5] Monroe's photograph was actually one of 22-year-old Master at Arms Second Class (MA2) KJ, who was attached to the NCIS Resident Agency in Okinawa.[6] The photograph showed her face and long light-brown hair. A factfinder could easily believe it depicts a 14-year-old girl. Upon seeing Appellant's photograph, she commented, "unique eyes," to which Appellant responded, "Yours aren't to bad either."[7]

Appellant volunteered he was a Marine and learned Monroe lived on Camp Foster with her single mother, who served in the Navy.[8] Appellant asked, "Cool your mom ok with you dating" to which Monroe replied, "Only a year older than me" with an emoji showing enlarged eyes with a protruding tongue.[9] Then she added, "But she doesn't have to know everything."[10]

---

[2] Prosecution Exhibit (PE) 1 at 1. All messages have been reproduced verbatim.

[3] *Id.*

[4] *Id.*

[5] *Id.* at 3.

[6] *Id.* at 5; PE 7. Of the seven photographs of MA2 KJ the Government provided to Appellant, six were taken when she was 22. One was taken when she was 13. PE 7. We believe a finder of fact could reasonably believe that all of the photographs of 22-year-old MA2 KJ depicted a 14-year-old girl.

[7] PE 1 at 6.

[8] *Id.* at 7.

[9] *Id.*

[10] *Id.* at 8.

[Appellant]: What's that supposed to mean lol

[Monroe]: Plus I'm mad at her she goes to Kadena to spend the night with her bf like once a week

[Monroe]: So I'm alone some anyway

[Appellant]: Oh

[Monroe]: Yep

[Appellant]: Why does she leave you

[Monroe]: I guess she wants to see her bf

[Monroe]: I mean I'm 14 not a baby

[Appellant]: True. Send a full body pic touching your nose.[11]

Monroe replied, sending a picture of her face showing her in a Winnie the Pooh sweatshirt. Just like the previous picture, it depicts a 22-year-old MA2 KJ.[12] Appellant and Monroe again exchanged photos, but this time he asked her to touch her forehead with two fingers.[13] The two lightheartedly confirmed they were not being "catfished"—a manner of deceiving someone in an online profile.[14] Again, the photograph is of a 22-year-old MA2 KJ.[15] Appellant, apparently satisfied Monroe was who she claimed, requested they continue their conversation on a different messaging application. When Monroe told him her mother blocked that application on her device, Appellant asked if she could text. Monroe told him her mother sometimes asks to see her text messages, making it "too risky."[16] This led to the following exchange:

[Monroe]: It's ok this sounds like drama

[Monroe]: It was nice talking to you

[Appellant]: No drama lol just trying to get a easier way to talk

[Monroe]: Whisper is my safest cause my mom doesn't know about it

---

[11] *Id*. at 9.

[12] *Id*. at 12; PE 7.

[13] PE 1 at 10.

[14] *Id*. at 12-15.

[15] *Id*. at 13.

[16] *Id*. at 16.

[Monroe]: You know I can get in big trouble talking to you right?

[Monroe]: I have to be secretive

[Appellant]: Lol was about to say goodbye cutie[17]

When Monroe asked if Appellant wanted to "stop talking" and told him it is "up to you," Appellant responded, "I'll give it a shot," before reminding her she still owed him a "full body" picture.[18] Appellant received another photo of a 22-year-old MA2 KJ sitting on a bed wearing a black long sleeve shirt and very short red shorts.[19] Monroe told Appellant "you're demanding," to which he replied, "Is that a bad thing" with a winking emoji.[20]

Their chat ended that evening with Appellant writing, "bye hmu" [hit me up] along with an emoji showing a winking face blowing a kiss with a heart.[21] Monroe responded with two emojis showing enlarged eyes with a protruding tongue, with a winking and kissing/heart emoji.[22] This was followed by:

[Appellant]: Yummy

[Monroe]: What is

[Appellant]: That kiss[23]

The next day, Appellant contacted Monroe again asking if she remembered him. She responded, "How many guys do you think I talk to" and "You're the only older one."[24] Monroe reminded Appellant that her "mom doesn't know about whisper."[25] In this conversation, Monroe asked Appellant what he's "looking for on whisper" and he responded, "Idk [I don't know] random conversation friendship people to hangout with some occasions women."[26] Monroe told him, "Oh well I couldn't hang out in public" and "You're

---

[17] *Id.* at 17.

[18] *Id.* at 18.

[19] *Id.*; PE 7.

[20] PE 1 at 18.

[21] *Id.* at 21.

[22] *Id.*

[23] *Id.*

[24] *Id.* at 23.

[25] *Id.*

[26] *Id.* at 25.

twice my age."[27] Appellant replied, "True."[28] Monroe then said, "Dangerous lol" and "It's like when I tried alcohol I had to wait until my mom was gone overnight then do it at home."[29] Appellant then asked where she lives and suggested, "We could hangout."[30]

When Monroe asked "What would you want to do?" followed by a smiling emoji, Appellant responded, "Up to you" and "Have anything in mind I'm new here."[31] Monroe responded that she is "not very experienced," and likes "the guy to decide stuff."[32] She also reminded him any activity must be at her apartment "[c]ause public is no way" and she is "14 Pooh so [he is] the one with experience hanging out with girls lol."[33] Appellant wrote, "Ok well we can just hangout and see where things go."[34] The two continued back and forth discussing what they could do and whether Monroe was "hoping for something more" than just to "cuddle" or a "movie . . . or something."[35] Monroe reminded Appellant that coming to her apartment might just be too "[r]isky."[36]

Another day passed and Monroe and Appellant had another conversation.

[Appellant]: Lol I like you

[Appellant]: [winking and kissing/heart emoji]

[Monroe]: Why

[Monroe]: I'm pretty mature for a 14 year old huh?

[Monroe]: Lol

[Appellant]: Yep and now my gf [girlfriend]

[Monroe]: Am I

---

[27] *Id.*

[28] *Id.*

[29] *Id.*

[30] *Id.*

[31] *Id.* at 27.

[32] *Id.*

[33] *Id.*

[34] *Id.*

[35] *Id.* at 28-32.

[36] *Id.* at 32.

[Monroe]: [smiling face emoji]

[Monroe]: What do you want to do with your gf

[Monroe]: Haha that can happen in my apartment anyway no public lol

[Appellant]: Lay you down pull off your panties and lick the soul from your p***y

[Monroe]: Oh dang boy!

[Monroe]: I've never had that done to me

[Appellant]: You should let me[37]

From here, the pair discussed sneaking Appellant into her apartment the next time her mother would be absent. They also discussed having "sex" "and oral" and how Appellant would "teach" her.[38] Monroe told him she was scared to become pregnant and that he does not "want a 14 year old pregnant gf [girlfriend]."[39] After Appellant assured Monroe he will "pull out" he asked, "Wanna trade nudes."[40] Monroe clarified, "You want me to send you a nude?"[41] She explained she could not because she could "get in too much trouble" and any pictures she could send would have to be the type her mother could see "just in case," explaining, "I mean I'm 14 I would literally get murdered."[42]

Their plan for Appellant to visit Monroe's apartment when her mother was away overnight became more specific. Monroe gave him another chance to end their conversations, writing, "Idk [I don't know] Pooh do you even want to talk anymore I'm such a pain I know," to which Appellant responded, "Lol I'm not a creeper or anything promise."[43] When Appellant asked for "more pics" of Monroe, she sent him one of her—again a 22-year-old MA2 KJ—

---

[37] *Id.* at 37.

[38] *Id.* at 37-8.

[39] *Id.* at 39.

[40] *Id.* at 40.

[41] *Id.*

[42] *Id.* at 42.

[43] *Id.* at 44.

smiling behind a Winnie the Pooh stuffed animal.[44] Appellant responded, "Cutiepie" and "That's my babe."[45]

The next morning, their conversation continued. Monroe again referenced her age by saying it will be "[a]lmost like a year and a half" until she "turn[s] 16" when she will be able to drive.[46] Monroe asked Appellant if she is "actually [his] gf [girlfriend]."[47] Appellant responded, "If you want to be."[48] Monroe replied with a smiling face emoji and asked, "If your ok with me being 14 and I can't like see you in public."[49] Appellant told her he was fine with that and he would message her from another account so they could talk while he was at work. Before the conversation ended, she wrote, "You probably want a girl your age more," to which Appellant replied, "Lol show me another full body pic."[50] Appellant received another picture of MA2 KJ, but this time it was a clothed full-body picture of her when she was actually 13 years old with the message, "This was a few months ago in the states."[51] Appellant responded, "So hot!"[52]

Appellant then contacted Monroe from a different Whisper account.[53] She let him know her mother would be absent overnight that evening.[54] Monroe cautioned Appellant, "You never answered me about getting pregnant tho . . . I'm afraid of that."[55] Appellant told her, "I wouldn't get you pregnant at least not yet" and asked her "Are you a virgin."[56] The following exchange took place:

> [Monroe]: No

---

[44] *Id.* at 48; PE 7.

[45] PE 1 at 49.

[46] *Id.* at 51.

[47] *Id.* at 52

[48] *Id.*

[49] *Id.* at 53.

[50] *Id.* at 54.

[51] *Id.* at 55.

[52] *Id.*

[53] *Id.* at 56.

[54] *Id.* at 57.

[55] *Id.* at 58.

[56] *Id.*

[Monroe]: Three times

[Appellant]: Ok warning you I'm big

[Monroe]: Oh dang how big

[Appellant]: I'll let you judge

[Monroe]: Ok you said oral for sure but maybe sex tonight?

[Appellant]: Do you wanna do that? I do

[Monroe]: Oral is cool but I'm afraid of getting pregnant

. . . .

[Monroe]: I heard pulling out doesn't really work

[Appellant]: I could use a condom

[Monroe]: Sorry I'm so scared I just can't be a 14 year old pregnant girl[57]

Their conversation continued and they arranged for their rendezvous. Appellant requested one more picture. Monroe sent him another picture of MA2 KJ—one taken when she was 22 years old. This picture showed her face and legs in a sitting position.[58] Appellant replied, "So beautiful."[59]

Three times Monroe asked Appellant to bring some gummy bears, and he responded "ok."[60] She also asked if he "decide[d] to bring condoms."[61] Their conversations ended just before NCIS agents apprehended Appellant, who was carrying both the gummy bears and condoms.

## II. DISCUSSION

### A. Entrapment

At trial, Appellant asserted the affirmative defense of entrapment. The military judge properly instructed the members under RULE FOR COURTS-MARTIAL (R.C.M.) 916(g).[62] On appeal, he again claims the Government en-

---

[57] *Id*. at 58-9.

[58] *Id*. at 64; PE 7.

[59] PE 1 at 65.

[60] *Id*. at 66-8.

[61] *Id*. at 69.

[62] R.C.M. 916(g), MANUAL FOR COURTS-MARTIAL (MCM), UNITED STATES (2016).

trapped him and therefore his convictions are both legally and factually insufficient. Because we find the Government did not induce Appellant into his actions, and Appellant acted according to his predisposition, he was not entrapped.

### 1. Inducement

For the Government to entrap someone, it must first engage in some kind of inducement.[63] Inducement requires more than the Government simply providing the "opportunity or facilities to commit the crime" but must rise to the level of "conduct that creates a substantial risk that an undisposed person or otherwise law-abiding citizen would commit the offense."[64] Inducement may take the form of pleas, coercion, threats, or fraudulent representations.

Appellant argues the Government agent posing as "Monroe" induced him to action. Specifically, Appellant points out that the NCIS special agent first suggested they use her apartment to meet and that the special agent kept bringing the conversation back to what they should do together. Appellant also contends the NCIS special agent encouraged Appellant to think of her as his girlfriend. Finally, Appellant contends that because the Government sent Appellant some pictures of a 22-year-old woman, he was induced by the Government.

In reviewing the conversations, we do not agree with Appellant's characterization. While the NCIS special agent may have suggested "Monroe's" apartment as a place to meet, the context of the conversation makes clear that Monroe made this suggestion because of her tender age and the "risk" of being together "in public." This was after Appellant verified he was not being "catfished," called her "cutie," sent her a kissing emoji, and responded to her kissing emoji with "yummy."[65] This suggestion was not made until after Monroe told him of her relative age three times. It was Appellant, and not Monroe, who encouraged Monroe to think of her as his girlfriend. Finally, of the seven photographs of MA2 KJ, six were taken when she was 22 years old. However, all of them, especially when placed in the context of the conversa-

---

[63] *United States v. Howell*, 36 M.J. 354, 359-60 (C.A.A.F. 1993).

[64] *United States v. Hall*, 56 M.J. 432, 436 (C.A.A.F. 2002) (citations and internal quotation marks omitted).

[65] PE 1 at 12-15, 17, 21.

tions, easily pass for those of a 14-year-old girl. Most telling is Appellant's reaction to the photo of 13-year-old MA2 KJ when he responded, "So hot!"[66]

Even if Appellant's view of the communications was accurate, this would still not rise to the level of Government inducement. We do not agree that an undisposed person or an ordinary law-abiding person would be induced to sexual contact with a 14-year-old girl merely by discussions of what they might do together when alone or offers to think of her as a girlfriend. We note that it was Appellant who first introduced the idea of nude pictures with someone whom he believed was a 14-year-old girl.

### 2. Predisposition

A predisposition is demonstrated when "a person accepts a criminal offer without being offered extraordinary inducements."[67] The Government is not required to have evidence of an accused's criminal activity before approaching.[68] Here, we find no "extraordinary inducements" in the communications between the NCIS special agent and Appellant. The overall tone of the conversation was a straightforward, slow escalation by Appellant of his overt sexual desires–including his desire for child pornography. The Government did not use an elaborate or confusing scheme, in which an innocent person could inadvertently cross the threshold of misconduct.[69] Monroe also gave Appellant several opportunities to cut off contact with her if he so desired.

It was Appellant and not Monroe who first turned the conversation into an overtly sexual one. He did so only after engaging in a lengthy exchange of specifically requested photographs to satisfy himself Monroe was a real girl and not someone else. At first, the conversation generally involved the topics of being boyfriend-girlfriend, Monroe letting Appellant take charge, and the possibility that Monroe might get in trouble due to her young age. Then Appellant wrote that he wanted to "lay [Monroe] down," "pull off [her] panties,"

---

[66] *Id.* at 52.

[67] *United States v. Bell*, 38 M.J. 358, 360 (C.M.A. 1993) (quoting *United States v. Evans*, 924 F.2d 714, 718 (7th Cir. 1991)).

[68] *Id.* (citing *United States v. Swets*, 563 F.2d 989, 991 (10th Cir. 1977), *cert. denied*, 434 U.S. 1022 (1978)).

[69] *See*, *e.g.*, *Jacobson v. United States*, 503 U.S. 540 (1992) (finding the Government enticed appellant into purchase of explicit materials in complicated scheme mixing legal and political materials with illegal explicit materials).

and "lick the soul from [her] p***y."[70] Simply put, Appellant demonstrated his predisposition by his own actions.

## B.  Legal and Factual Sufficiency

Having found no entrapment by the Government, we now review Appellant's convictions for legal and factual sufficiency de novo.[71] The test for factual sufficiency is whether "after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, [this court is] convinced of Appellant's guilt beyond a reasonable doubt."[72] In conducting this unique appellate function, we take "a fresh, impartial look at the evidence," applying "neither a presumption of innocence nor a presumption of guilt" to "make [our] own independent determination as to whether the evidence constitutes proof of each required element beyond a reasonable doubt."[73] When conducting this review, we are "limited to the evidence presented at trial."[74] Proof beyond a reasonable doubt does not mean, however, that the evidence must be free from conflict.[75]

When testing for legal sufficiency, we look at "whether, considering the evidence in the light most favorable to the prosecution, a reasonable factfinder could have found all the essential elements beyond a reasonable doubt."[76]

To sustain an attempt conviction under Article 80, UCMJ,[77] the Government must prove beyond a reasonable doubt: (1) that Appellant made a certain overt act; (2) that amounted to more than mere preparation; (3) that apparently tended to effect the commission of a crime; and (4) that the act was done with specific intent to commit another offense under the UCMJ. Here,

---

[70] PE 1 at 37.

[71] Art. 66, UCMJ; *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002).

[72] *United States v. Rosario*, 76 M.J. 114, 117 (C.A.A.F. 2017) (citation, internal quotation marks, and emphasis omitted).

[73] *Washington*, 57 M.J. at 399.

[74] *United States v. Pease*, 75 M.J. 180, 184 (C.A.A.F. 2016) (quoting *United States v. Beatty*, 64 M.J. 456, 458 (C.A.A.F. 2007)).

[75] *United States v. Goode*, 54 M.J. 836, 841 (N-M. Ct. Crim. App. 2001).

[76] *United States v. Turner*, 25 M.J. 324 (C.M.A. 1987) (citing *Jackson v.* Virginia, 443 U.S. 307, 319 (1979)); see *also United States v. Robinson*, 77 M.J. 294, 297-98 (C.A.A.F. 2018).

[77] 10 U.S.C. § 880 (2012).

the underlying offenses were sexual assault of a child (sexual intercourse and oral sex)[78] and sexual abuse of a child (various lewd acts).[79]

To sustain a conviction for soliciting child pornography under Article 134, UCMJ,[80] the Government must prove beyond a reasonable doubt: (1) that Appellant solicited another to commit an offense under the UCMJ; (2) did so with the specific intent the offense be committed; and (3) that this action was to the prejudice of good order and discipline or was a nature to bring discredit to the armed forces.

The case against Appellant was strong. His own words were captured by the NCIS special agent during the investigation and admitted into evidence. He was apprehended in an apartment building, on the floor where the NCIS special agent told him a 14-year-old girl was waiting alone in her apartment. He came prepared with two condoms, having previously discussed Monroe's concerns about avoiding a teenage pregnancy.

However, the Government failed to produce sufficient evidence for clause 1 of the terminal element of the sole specification of Charge II, which alleged Appellant solicited Monroe to distribute child pornography under Article 134. The Government charged and argued to members in the conjunctive, but only attempted to provide evidence that Appellant's conduct was prejudicial to good order and discipline. In support of clause 1, the Government presented the opinion testimony of Investigator GH, a U.S. Army military policeman assigned to NCIS. He opined that Appellant's actions in soliciting child pornography from someone whom he believed was a 14-year-old girl "was prejudicial to good order and discipline in the armed forces."[81] Not only is this improper opinion testimony, it is insufficient to support the terminal element

---

[78] 10 U.S.C. § 920b(b) (2012).

[79] The lewd acts were Appellant saying: (1) "lay you down pull off your panties and lick the soul from your p***y"; (2) "I'll pull out"; (3) "Wanna trade nudes"; (4) "I wouldn't get you pregnant at least not yet"; (5) "Are you a virgin"; (6) "Ok warning you I'm big"; and (7) "I could use a condom," to what he believed was a 14-year-old girl. PE 1 at 37, 40, 58, and 59, respectively; 10 U.S.C. § 920b(c) (2012).

[80] 10 U.S.C. § 934 (2012).

[81] From the wording of the question, it appears to conflate clause 1 and clause 2. A common practice is to ask a witness for an opinion on whether the accused's alleged misconduct "was of a nature to bring discredit on the armed forces."

for clause 1. The Government is required to prove *direct* prejudice to good order and discipline.[82]

For clause 2, "proof of the conduct itself *may* be sufficient for a rational trier of fact to conclude beyond a reasonable doubt that, under the circumstances, it was of a nature to bring discredit upon the armed forces."[83]

"At findings, the Trial Counsel or Military Judge must make certain that the record is clear as to whether the trier of fact found that clause 1, clause 2, or both clauses were proven beyond a reasonable doubt."[84] The members convicted Appellant of the specification as charged. We find evidence for clause 1 of the required terminal element to be legally and factually insufficient. However, we find Appellant's conduct itself constitutes sufficient proof that his offenses were of a nature to bring discredit upon the armed forces.[85] Therefore, we find the evidence for clause 2 of the terminal element to be legally and factually sufficient. We will except the clause 1 language from the specification in our decretal paragraph.

After carefully reviewing the record of trial and considering all of the evidence in a light most favorable to the prosecution, we are convinced a rational factfinder could have found Appellant attempted to sexually assault a child and sexually abuse a child under the age of 16, and solicited an NCIS special agent to distribute child pornography, which was of a nature to bring discredit upon the armed forces. Also, having weighed all the Government and defense evidence admitted at trial and made allowances for not having personally observed the witnesses, we too are convinced beyond a reasonable doubt of Appellant's guilt to the charges and specifications with the excepted language.

**C. Sentence Reassessment**

Having disapproved language in the sole specification of Charge II, we must now consider whether we can reassess the sentence pursuant to *United States v. Winckelmann*.[86] After analyzing the *Winckelmann* factors, we can

---

[82] MCM, Part IV, ¶ 60.c.(2)(a); *see also United States v. Caballero*, 23 U.S.C.M.A. 304, 306 (C.M.A. 1975).

[83] *United States v. Phillips*, 70 M.J. 161, 163 (C.A.A.F. 2011) (emphasis in the original).

[84] MCM, App. 23 at A21.

[85] *See Phillips*, 70 M.J. at 163.

[86] 73 M.J. 11 (C.A.A.F. 2013).

confidently and reliably determine that Appellant's sentence would be unchanged.

**D. Errors in Promulgating Order**

Although not raised by the parties, we note the court-martial order (CMO) does not accurately reflect Appellant's pleas and findings. The sole specification of Charge II alleged Appellant wrongfully solicited NCIS Special Agent MK "to produce and distribute child pornography."[87] Pursuant to R.C.M. 917, the military judge found Appellant not guilty of production of child pornography and excepted out the words "to produce and" from the specification.[88] The CMO reflects a plea of not guilty for the amended charge, but does not reflect Appellant's pleas and findings for the original charge. Although we find no prejudice from this scrivener's error, Appellant is entitled to have court-martial records that correctly reflect the content of his proceeding.[89]

## III. CONCLUSION

After careful consideration of Appellant's assigned error, the record of trial, and the parties' submissions, we conclude the findings for Charge I are correct in law and fact. With respect to the sole specification under Charge II, we except out the language, "and that such conduct was to the prejudice of good order and discipline in the armed forces," and find the Charge and Specification is correct in law and fact. Because this exception has no bearing on the sentence, we find the sentence is correct in law and fact and find no error materially prejudiced Appellant's substantial rights. Arts 59 and 66, UCMJ. Accordingly, the findings as modified and sentence as reassessed are **AFFIRMED**.

The supplemental CMO shall reflect an accurate summary of Appellant's pleas and findings. The CMO shall reflect that Appellant pleaded not guilty to the original sole specification under Charge II and was found not guilty of the words "to produce and" from the specification. In addition, the CMO shall except out the words "and that such conduct was to the prejudice of good order and discipline in the armed forces," from the amended sole specification of Charge II.

---

[87] Charge Sheet.

[88] Record at 629-30.

[89] *United States v. Crumpley*, 49 M.J. 538, 539 (N-M. Ct. Crim. App. 1998).



FOR THE COURT:

RODGER A. DREW, JR.
Clerk of Court